539 A.2d 1107

**CAMELBACK SKI CORPORATION**

v.

**Ralph C. BEHNING et al.**

**No. 32, Sept. Term, 1985.**

Court of Appeals of Maryland.

April 11, 1988.

Paul W. Grimm (Barrett W. Freedlander and Niles, Barton & Wilmer, Baltimore, Stephen P. Kling (argued), Crummey & Kling, Annapolis, on the brief) for appellant.

Edward S. Digges, Jr., Michael T. Wharton, Digges, Wharton & Levin, Annapolis, William H. Crabtree and Edward P. Good, Detroit, Mich., on brief, for Motor Vehicle Manufacturers Ass'n of the United States, Inc., and The Product Liability Advisory Council, Inc., amicus curiae.

Philip O. Foard (Dennis F. O'Brien and White, Mindel, Clarke & Hill, on the brief), Towson, for appellees.

Argued before MURPHY, C.J., ELDRIDGE, COLE, RODOWSKY, McAULIFFE, JJ., and MARVIN H. SMITH and JAMES F. COUCH, Jr., Associate Judges of the Court of Appeals of Maryland (retired), Specially Assigned.

McAULIFFE, Judge.

In *Camelback Ski Corp. v. Behning*, 307 Md. 270, 513 A.2d 874 (1986) (Camelback I), we held that the Due Process

Clause of the Fourteenth Amendment precluded a Maryland court from exercising personal jurisdiction over the operator of a Pennsylvania ski resort under the particular facts of that case. Thereafter, the United States Supreme Court granted Respondents' petition for a writ of certiorari, and by summary order vacated the judgment and remanded the case to this Court for further consideration in light of *Asahi Metal Industry Co., Ltd. v. Superior Court of California,* —— U.S. ——, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987), a case decided one week earlier. *Behning v. Camelback Ski Corporation,* —— U.S. ——, 107 S.Ct. 1341, 94 L.Ed.2d 512 (1987). With the benefit of additional briefing and oral argument, we have reconsidered the case, and now affirm our earlier determination.

We reproduce from our earlier opinion a summary of the basic facts of this case:

> Ralph Behning, a Maryland resident, suffered severe and permanent injuries in February, 1980, when he fell while skiing at Camelback, a ski resort owned and operated by Camelback Ski Corporation (Camelback) and located in the Poconos mountains of Pennsylvania. In October, 1982, Behning and his wife sued Camelback in the Circuit Court for Baltimore County, claiming damages for alleged negligence of Camelback in the design, construction, maintenance, and "grooming" of one of its ski slopes, and in the failure to correct, or give adequate warning of, an unreasonably dangerous condition on the land.

> \* \* &#x2612; &#x2638; \* \*

> Camelback is a Pennsylvania corporation with no charter or license to do business in Maryland, and no agent for service of process in this State. No bank accounts or telephone listings are maintained by Camelback in Maryland, and no taxes are paid to this State. Camelback sells no products here and derives its total income from its ski resort in Pennsylvania.

*Camelback I, supra,* 307 Md. at 272, 280. 513 A.2d 87 ?

Camelback also sought to purchase toll-free telephone numbers solely for its marketing area states, but found that service for Maryland was necessarily included in the package it was required to buy. Camelback included the Maryland toll-free number on its brochures, but it did not generally or systematically distribute its brochures in this State.[1]

Camelback is principally a "day" [2] resort, although it does receive some "destination business." Its market area, to which it devotes one hundred percent of its advertising budget, is comprised of those parts of Pennsylvania, New York, and New Jersey lying within a 100–mile radius of the resort. On one occasion in 1982, for a period of one or two days, a sales representative of Camelback called on travel agencies and military installations in Maryland, in an attempt to stimulate mid-week destination business. This effort was unsuccessful, and was not repeated.

Camelback was aware that some of its customers came from Maryland. The record does not disclose what percentage of Camelback's customers were from this State, or whether Camelback had any means of obtaining information concerning the State of residence of its customers. Behning's trip to Camelback did not result from any solicitation by Camelback within this State.

*Asahi Metal Industry Co. Ltd. v. Superior Court, supra,* was a successful challenge to a California state court's exercise of personal jurisdiction in a controversy that ultimately involved only Japanese and Taiwanese corporations. The action was initiated by a California resident who was

---

1. On request, Camelback would mail its brochures to any ski shop requesting them. It received five or six requests a year from ski shops in Maryland.

2. This term refers to the fact that a majority of the resort's clientele comes to the area for a day of skiing and then returns home. In contrast, a "destination" resort is one which attracts skiers for extended periods of time. Camelback has no facilities for lodging guests. It has made available to some local hotels and motels discount ski lift tickets, but it has not participated in the advertising efforts of those establishments.

injured as the result of a motorcycle accident. Alleging that the accident was caused by a sudden loss of air from the rear tire of his motorcycle, the plaintiff sued, among others, Cheng Shin Rubber Industrial Co., Ltd. (Cheng Shin), the Taiwanese manufacturer of the tire tube. Cheng Shin in turn filed a complaint for indemnification against Asahi Metal Industry Co. Ltd., (Asahi), the Japanese manufacturer of the tube's valve assembly. Asahi moved to quash service of Cheng Shin's summons, arguing that California could not exercise jurisdiction over Asahi consistent with the Due Process Clause of the Fourteenth Amendment. Asahi's motion was considered after all claims other than that of Cheng Shin against Asahi had been resolved.

The facts show that Asahi manufactured valve assemblies in Japan and sold them to Cheng Shin, among others. Cheng Shin accepted delivery of the valve assemblies in Taiwan, and there manufactured the finished tube. Cheng Shin purchased valve assemblies from other suppliers as well, and sold finished tubes throughout the world. Although Asahi had no control over Cheng Shin's system of distribution, there was evidence that Asahi knew that some of the valve assemblies sold to Cheng Shin would be incorporated into tire tubes which would ultimately be sold in California.

The Supreme Court analyzed the facts of *Asahi* with respect to two separate but related questions. First, the Court considered, and divided sharply on, the question of whether Asahi had sufficient contacts with California to justify that State's assumption of personal jurisdiction over this type of claim. Second, the Court considered whether, under all the circumstances, assumption of jurisdiction by the State court would offend traditional notions of fair play and substantial justice. Eight justices, after considering the factors set forth in *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980), agreed that even if the threshold test of minimum contacts had been met, the exercise of jurisdiction would not be fair or reasonable.

Considering the international context, the heavy burden on the alien defendant, and the slight interests of the plaintiff and the forum State, the exercise of personal jurisdiction by a California court over Asahi in this instance would be unreasonable and unfair.

*Asahi, supra,* 107 S.Ct. at 1035.

The specific holding of *Asahi* has no direct impact on our decision in this case. *Asahi* is "one of those rare cases" in which traditional notions of fair play and substantial justice defeat the reasonableness of jurisdiction even though the threshold requirement of minimal contacts may have been met. 107 S.Ct. at 1035 (Brennan, J., concurring in part). We held in *Camelback I* that there were insufficient contacts to satisfy the threshold test of jurisdiction. Although we did not specifically address the second and more general test of essential fairness under all the circumstances, we noted that several of the factors applied in that analysis militated in favor of the exercise of jurisdiction. We stated, however, that those factors "cannot alone serve as the foundation for assumption of jurisdiction." *Camelback I,* 307 Md. at 286, 513 A.2d 874.

We turn, then, to the Supreme Court's extensive discussion of what is ordinarily the first question in personal jurisdiction cases [3]—the nature and extent of contacts that must be shown between the forum and the defendant to satisfy the threshold demands of fairness. *Asahi* may be characterized as a "stream of commerce" case. It involves a manufacturer placing a component part into the stream of commerce, and an allegation that a consumer of the product was injured because the component was unreasonably dangerous when sold.

---

**3.** Although we find it convenient to speak of the contacts analysis as the first, or threshold, inquiry, and recognize that in the great majority of cases this analysis will control the outcome of the jurisdiction question, we observe, as did Justice Stevens in his concurring opinion in *Asahi,* that where jurisdiction is rather clearly precluded by the overall fairness analysis it may be neither necessary nor desirable to engage in the contacts analysis.

Four justices were of the opinion that if there exists a "regular and anticipated flow of products from manufacture to distribution to retail sale," a participant in that process who "is aware that the final product is being marketed in the forum State" has sufficient contacts with the forum to satisfy the threshold jurisdictional inquiry. 107 S.Ct. at 1035 (Brennan, J., concurring in part). The rationale of that position is that "[a] defendant who has placed goods in the stream of commerce benefits economically from the retail sale of the final product in the forum State, and indirectly benefits from the State's laws that regulate and facilitate commercial activity." *Id.* Participation in an ongoing stream of commerce with full awareness of ultimate sales in the forum State is therefore considered to be an "act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State," thus satisfying the test of *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475, 105 S.Ct. 2174, 2183, 85 L.Ed.2d 528 (1985), and *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 1239, 2 L.Ed.2d 1283 (1958).

Four other justices were of the opinion that simply placing a product into the stream of commerce under circumstances where it was foreseeable that sales would result in the forum jurisdiction did not satisfy the threshold requirement of sufficient contacts. The plurality said:

The placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State.... [A] defendant's awareness that the stream of commerce may or will sweep the product into the forum State does not convert the mere act of placing the product into the stream into an act purposefully directed toward the forum State. *Asahi, supra,* 107 S.Ct. at 1033.

The ninth justice, Justice Stevens, eschewed any need to articulate in *Asahi* a test to be applied in stream-of-commerce cases, but added that even if something more than "mere awareness" is needed to constitute "purposeful availment," the Asahi corporation's activities may have satisfied

the required higher quantum of conduct.[4] 107 S.Ct. at 1038.

The case before us is neither a product liability case, nor a conventional stream-of-commerce case. As the Behnings point out, however, this case shares at least one very important feature of the stream-of-commerce cases—the defendant knowingly and regularly derives economic benefit from the business of residents of the forum State.

 The Behnings correctly assert that forcing all cases into a rigid classification as either "general jurisdiction" or "specific jurisdiction" cases, and then mechanically applying a fixed standard for the quantum of contacts required to support personal jurisdiction in each class, would be inappropriate. We agree that the quality and quantity of contacts required to support the exercise of personal jurisdiction will depend upon the nature of the action brought and the nexus of the contacts to the subject matter of the action. We further agree that the spectrum of cases may be generally divided into those involving general jurisdiction (the cause of action is unrelated to the contacts), and those involving specific jurisdiction (the cause of action arises out of the conduct which constitutes the contacts). Generally speaking, when the cause of action does not arise out of, or is not directly related to, the conduct of the defendant within the forum, contacts reflecting continuous and systematic general business conduct will be required to sustain jurisdiction. *Helicopteros Nacionales de Colombia v. Hall,* 466 U.S. 408, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984); *Hanson v. Denckla, supra,* 357 U.S. at 251, 78 S.Ct. at 1238; *Camelback I, supra* 307 Md. at 279–80, 513 A.2d 874. On the other hand, when the cause of action arises out of the contacts that the defendant had

---

**4.** Justice Stevens suggests that the duration and regularity of the course of dealings, together with the volume, the value, and the hazardous character of the product must be taken into consideration. *Asahi, supra,* 107 S.Ct. at 1038 (Stevens, J., concurring in part).

with the forum, it may be entirely fair to permit the exercise of jurisdiction as to that claim.

Some cases fit neatly into one or the other category. *Asahi* was clearly a specific jurisdiction case—the cause of action arose out of the only contact that Asahi had with the forum State. Similarly, *McGee v. International Life Ins. Co.*, 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957), involved a claim arising out of the issuance and delivery of a single life insurance policy by a Texas insurance company to a California resident, and was therefore a case involving specific jurisdiction. By way of contrast, *Perkins v. Benguet Mining Co.*, 342 U.S. 437, 72 S.Ct. 413, 96 L.Ed. 485 (1952), involved a cause of action that did not arise out of, or relate to, the activities of the defendant in the forum State, and was therefore a general jurisdiction case. The concept of specific and general jurisdiction is a useful tool in the sometimes difficult task of detecting how much contact is enough, and most cases will fit nicely into one category or the other. If, however, the facts of a given case do not naturally place it at either end of the spectrum, there is no need to jettison the concept, or to force-fit the case. In that instance, the proper approach is to identify the approximate position of the case on the continuum that exists between the two extremes, and apply the corresponding standard, recognizing that the quantum of required contacts increases as the nexus between the contacts and the cause of action decreases.

This case does not fit the classic mold of specific jurisdiction, and we find that the contacts required to support jurisdiction more nearly resemble those of a general jurisdiction case. Behning was not injured by any product Camelback sent into Maryland. There is no evidence that Behning went from Maryland to Pennsylvania in response to solicitation by Camelback. Yet, the Behnings argue the cause of action is not totally divorced from the contacts they rely upon, because Behning was one of a number of Maryland residents coming to Camelback to ski, and thus formed a part of a stream of commerce from which Camel-

back knew it derived economic advantage. The argument, though innovative, is not persuasive.

█ In the context of determining what is fair for purposes of jurisdiction, a significant difference exists between regularly placing goods into a stream of commerce with knowledge they will be sold in another state on the one hand, and knowingly accepting the economic benefits brought by interstate customers on the other hand. Ordinarily, one who purposefully sends[5] a product into another jurisdiction for purposes of sale may reasonably expect to be haled into court in that State if the product proves to be defective and causes injury there. In addition to having caused a direct injury within the forum State, that manufacturer or distributor has purposefully availed himself of the laws of the forum State that regulate and facilitate such commercial activity. The same cannot be said of the fixed-site merchant who is simply aware that a portion of his income regularly is derived from the patronage of customers coming from other states. The owner of a South Carolina motel located near Interstate Route 95, for example, may know that a significant portion of his income is derived from residents of New York traveling to and from Florida, but that fact alone should not require that he be forced to litigate in New York a suit brought by a patron who claims injury as a result of a fall in the South Carolina motel.[6] Although he may cause an indirect impact on the forum State by injuring one of its residents, he causes no

---

**5.** Resolution of the case before us does not require that we express our views concerning the circumstances from which "purposeful availment" might properly be inferred, or even presumed, in a typical stream-of-commerce case.

**6.** Compare *Markopoulos v. Walt Disney World,* 221 N.J.Super 513, 535 A.2d 26 (1987), holding that a sufficient amount of soliciation by media advertising directed to New Jersey, coupled with the fact that the plaintiff travelled to Florida in response to the solicitation, may support jurisdiction in New Jersey courts of a claim that plaintiff was injured in Florida when assaulted by Mickey Mouse.

direct injury in the State, and does not avail himself of the protection or assistance of its laws.

Concededly, Camelback's involvement with Maryland is more than mere awareness that some part of its income is regularly derived from the patronage of citizens of this State. Camelback was aware that others, for their own economic purposes, were publicizing the Camelback resort within the Washington and Baltimore metropolitan areas; that wire services routinely carried information concerning snow conditions on its slopes and that this information was reproduced in Maryland newspapers; that Maryland residents could, and probably were, using a toll-free telephone number to obtain information concerning snow conditions at the resort; and, that a small number of its brochures were occasionally requested by Maryland ski shop owners for distribution to their customers. On the other hand, Camelback did not devote its energy or financial resources to the marketing of Maryland. It allocated no part of its advertising budget to Maryland, and following one very brief and unsuccessful attempt to solicit business in this State in 1982, it abandoned any attempt to include Maryland in its primary marketing area, or to conduct any active solicitation here.

In examining Camelback's contacts with Maryland to determine whether they were sufficient to satisfy the threshold test for jurisdiction, we think it appropriate also to consider the several factors the Supreme Court has identified in connection with the second stage test of overall fairness. As we noted earlier, although it is convenient to speak of the two analyses as separate steps, the "threshold" step is not considered in a vacuum, nor must it invariably be the first step. Where the fairness factors of the second step militate strongly in favor of the exercise of jurisdiction, a lesser showing of minimum contacts than would otherwise be required might suffice. See *Burger King, supra,* 471 U.S. at 476–77, 105 S.Ct. at 2184, and Perdue, *Sin, Scandal, and Substantive Due Process: Personal Jurisdiction and Pennoyer Reconsidered,* 62 Wash.

L.Rev. 479, 518–19 (1987). The relevant factors include: the burden on the defendant; the interests of the forum State; the plaintiff's interest in obtaining relief; the interstate judicial system's interest in obtaining the most efficient resolution of controversy; and the shared interest of the several states in furthering fundamental substantive social policies. *Asahi, supra,* 107 S.Ct. at 1034.

The plaintiffs here clearly have a significant interest in obtaining relief, but in this respect we note that the plaintiffs could have maintained this action in Pennsylvania without suffering unreasonable inconvenience. This State has an interest in providing a forum for its injured citizens, but we must also recognize the legitimate interests and expectations of Camelback, a resident corporation of Pennsylvania. The burden imposed upon the defendant by requiring it to litigate this case in Maryland would not be extreme—but, as with the plaintiff being required to litigate in Pennsylvania, there would be some burden.

Our consideration of the "fairness" factors persuades us that: 1) if Camelback had had additional contacts with Maryland sufficient to satisfy the "minimum contacts" test for a threshold determination in favor of the exercise of jurisdiction over this cause of action, consideration of the factors in the second stage test probably would not result in an ouster of jurisdiction; and 2) to the extent our consideration of these factors would color our judgment at all concerning the quantum of contacts required to be shown, it would operate slightly in favor of the claim that Maryland should exercise jurisdiction.

With this in mind, we return to a consideration of whether, under all the circumstances, there has been a sufficient showing of contacts in this case. Recognizing that shades of grey predominate in this often difficult task of balancing interests and relevant factors on the scale of fairness, we again conclude that the conduct of Camelback does not mount up to the "purposeful availment" of the benefits or laws of this State that will satisfy the threshold test of

minimum contacts mandated by the Due Process Clause, nor do we find that the conduct of Camelback was such that it could have expected to be haled into the courts of Maryland to answer a claim of this kind. We affirm our earlier determination.

JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED AND CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO AFFIRM THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY. RESPONDENTS TO PAY THE COSTS.