956 A.2d 754

Andrea **TAYLOR**, et al.

v.

**CSR LIMITED**, et al.

**No. 02762, Sept. Term, 2006.**

Court of Special Appeals of Maryland.

Sept. 9, 2008.

364

Edward Lilly (Steven W. Smith, Jennifer L. Lilly, Law Office of Peter G. Angelos, on brief), Baltimore, for appellant.

F. Ford Loker (Laura A. Cellucci, Miles & Stockbridge, PC, on brief), Baltimore, for appellee.

Panel: HOLLANDER, PAUL E. ALPERT, (Retired, Specially Assigned) and SALLY D.* ADKINS, JJ.

ADKINS, J.

The estates of two stevedores alleged to have contracted cancer from exposure to asbestos while unloading bags of asbestos at the Port of Baltimore, appeal the dismissal of their claim for a lack of personal jurisdiction against an Australian company. CSR Limited, d/b/a Colonial Sugar Refining Co., Ltd. ("CSR"), appellee, is an Australian corporation alleged to have shipped bags of asbestos fiber to the Port of Baltimore at the time Alfred B. Smith and Joseph Anzulis worked there as stevedores. Andrea Taylor, personal representative for the Smith estate, and Mary Fuchsluger, personal representative for the Anzulis estate, present the following question for our review:

> Did the trial court err as a matter of law in granting CSR's motion to dismiss for lack of personal jurisdiction?

Viewing the evidence in the light most favorable to appellants, we conclude that appellants made a prima facie case that CSR has sufficient contacts in Maryland to support personal jurisdiction for these causes of action.

---

* Adkins, Sally D., J., now serving on the Court of Appeals, participated in the hearing and conference of this case while an active member of this Court; she participated in the adoption of this opinion as a specially assigned member of this Court.

## FACTS AND LEGAL PROCEEDINGS

The estates (hereinafter together referred to as "Taylor"), sued several corporate entities including CSR, alleging that Smith and Anzulis, while working as stevedores at the Port of Baltimore, were exposed injuriously to asbestos fibers exported by CSR while offloading bags containing asbestos. Taylor maintains that as a result of this off-loading, Smith and Anzulis contracted mesothelioma, a cancer caused by exposure to airborne asbestos fiber. Taylor alleges multiple causes of action, including strict liability, breach of warranty, negligence, and fraud.

Taylor alleges that CSR operated an asbestos mine through a wholly owned subsidiary, Australia Blue Asbestos Pty. Limited ("ABA"), and CSR, as the mine's exclusive distributor, exported asbestos fiber for sale to customers in the United States, particularly Johns–Manville International.[1] CSR is alleged to have made such exports from 1943 to 1966, with some of the shipments passing through the Port of Baltimore.

Smith and Anzulis worked at the Port unloading cargo from approximately 1942 through 1983 and 1937 through 1973, respectively. Lloyd M. Gardner, Sr., a co-worker of Smith and Anzulis, stated in an affidavit that he unloaded, among other various cargos, thousands of burlap bags containing loose asbestos, shipped to Baltimore from foreign ports. According to Gardner, he unloaded shipments of asbestos from Australia up to six times a year in the 1950s and 60s, and some of these bags had a diamond-shaped logo on them with the letters "CSR." Gardner also testified in a deposition that the offloading of the bags produced dust. Gardner remembers Smith and Anzulis being present when the dust-producing work took place. William Gardner, Lloyd Gardner's brother and a stevedore who worked at the Port from 1961 until 1970, also indicated in deposition testimony that he recalled unloading CSR-labeled burlap bags containing asbestos, that dust

---

1. CSR is a corporation organized and existing solely under the laws of Australia. Its principal place of business is in Sydney, Australia.

would be "all over the place[,]" and that Smith and Anzulis were present during these unloading jobs.

From 1943 to 1966, CSR owned a subsidiary, ABA, that mined and packaged crocidolite asbestos in Western Australia. During that time, CSR functioned as ABA's agent for asbestos fiber sales to customers in the United States. In addition to its asbestos export activities, CSR was involved in the sugar refining and export business. CSR had an agreement with the state of Queensland, Australia, to market all Australian exports of raw sugar, including the arrangements for sale, transport, insurance and financing.[2] Maryland Port Authority statistics indicate that during the years of 1964 through 1966, approximately 82,847 tons of raw sugar were imported to the Port of Baltimore from Australia having a total value of $10,921,373, a value in 2005 dollars of over $66.5 million.

On October 10, 2005, CSR filed a motion to dismiss Taylor's complaint against CSR on the ground that Maryland does not have personal jurisdiction. In an affidavit, Edwin Anthony Smith, manager of CSR's Group Financial Reporting,[3] stated

---

2. In a 1968 booklet published by CSR entitled "Notes on the Australian Sugar Industry," CSR indicated that it "markets all Australian exports of raw sugar including the arrangements for sale, transport, insurance and financing[,]" and that the United States, in receiving 158,000 tons, was the fourth largest recipient of Australian raw sugar in 1966. Taylor asserts in her brief that CSR's contract to market Australia's sugar exports was "in place in 1956, the date of CSR's alleged first sale and shipment of asbestos fiber to Baltimore as reflected in the available CSR records." Although the 1968 CSR publication, to which Taylor cites, indicates that CSR was "[u]nder contract with the Queensland Government ... [to] market[ ] all Australian exports of raw sugar[,]" it does not specify when CSR first entered into the sugar marketing contract. CSR, in its brief, does not, however, challenge Taylor's assertion that the sugar export contract was in place in 1956, stating that it "accepts, in part, Appellants' Statement of Facts, except where Appellants are argumentative."

3. Taylor takes issue with Smith's affidavit, contending that Smith's statements were not based upon his own personal knowledge of events. Taylor concludes from Smith's deposition testimony taken on November 30, 2005, that Smith's statements are attributable to a conversation Smith had with Keith Osborne Brown, an executive with CSR, in 1995 and conversations Smith had with CSR's legal counsel. Smith indicat-

that CSR has never been incorporated or licensed to do business in Maryland, nor has it ever appointed an agent for purposes of accepting service of process in Maryland. According to Smith, CSR has never conducted or solicited any business in Maryland; has never had any employees or agents based or residing in the state; has never maintained an office, telephone listing, mailing address or bank account in Maryland; and has never owned, leased, or possessed any interest in real or personal property in the state. Smith asserts that CSR has never conducted an asbestos-related business in Maryland, has never been a party to any contract in the state, and has not been required to perform any contract in the state. Smith also states that CSR has never manufactured, produced, merchandised, marketed, supplied, distributed, sold or installed asbestos products in Maryland. According to Smith's understanding, the purchaser of asbestos fiber was "basically responsible for it" when it left the port in Australia and where it went "was dictated by the purchaser."

In opposition to CSR's motion to dismiss, Taylor provided as exhibits four invoices, indicating CSR shipments of asbestos fiber from Australia to the Port of Baltimore during the period of time in which Smith and Anzulis worked as stevedores.[4] Taylor also provided an affidavit of Captain Robert Stewart, a maritime expert, indicating that three of the four invoiced shipments were made pursuant to "C.&.F./C.I.F." shipping contracts, short for "Cost and Freight[,]" in which CSR, as the "seller/shipper/consignor" of the asbestos fiber, was obligated to package and mark the asbestos fiber, identifying the contents and port destination; prepare an invoice; contract for marine insurance; obtain necessary shipping documents, such as export licenses; pay all freight charges to the carrier,

---

ed in his deposition testimony that he had not seen a contract between CSR and any of its customers, nor did he have expertise in maritime shipments or maritime law.

4. The shipping invoices included one addressed to Johns–Manville Corporation in 1956, another addressed to Huxley Development Corporation in 1963, and two addressed to Orangeburg Manufacturing Company in 1964 and 1965.

including costs associated with hiring a stevedore company to unload the cargo; obtain a clean negotiable bill of lading, covering the transportation to Baltimore; and remain responsible for the cargo until it arrived and was unloaded in Baltimore, at which time the buyer accepted the cargo. Stewart also indicated that under C.&.F. or CIF agreements, CSR would have access to Maryland courts if any of the buyers wrongly failed to accept the asbestos shipments upon delivery in Baltimore. According to Stewart, the terms of the four invoices indicate that the shipments cumulatively weighed over 1.2 million pounds, consisting of 13,332 individual bags of asbestos fiber.[5]

Taylor also provided the court with an affidavit of Dr. Barry Castleman, an environmental consultant with expertise regarding the history of the asbestos industry and development of knowledge of asbestos disease and worker health. Castleman provided his opinion that from 1943 to 1966, CSR would have known that burlap bags containing asbestos fiber from ABA's mine in Western Australia were handled and unloaded by stevedores at various ports and that such bags would often break, tear, or be punctured, thereby exposing stevedores and others to airborne asbestos. Castlemen also stated that CSR regularly advertised the sale of ABA asbestos, from approximately 1942 through 1966, in *Asbestos*, a trade magazine of the United States asbestos industry. From 1954 to 1966, CSR placed advertisements in *Asbestos* issues every other month. Castlemen opined that CSR would have known that its marketing in *Asbestos* would have reached Maryland consumers, such as Porter Hayden and Wallace and Gale, Baltimore insulation contractors. According to Castlemen, CSR was aware of the potential health hazards of its crocidolite asbestos dust in the 1940s and became aware in the early 1960s that one of its mill workers had developed mesothelioma.

---

5. Dr. Jerome Paige, an economist, indicates in an affidavit submitted by Taylor that the cumulative value of the four shipments was over $100,000 in the 1950s and 60s, which, valued today, would be over $1,000,000.

On November 2, 2006, the Circuit Court for Baltimore City held a hearing on CSR's motion to dismiss and concluded in the following oral ruling that CSR lacked substantial meaningful contacts with Maryland and that subjecting CSR to the court's jurisdiction would be constitutionally unfair:

So the minimum contacts that are necessary to be shown, four invoices in this Court's opinion, at least, do not indicate any meaningful contact with the State of Maryland such that one could say that this indicates that they would anticipate that the defendant could anticipate that he would be hailed into court in this State.

I know that the plaintiff says that it is not just four invoices, that there were substantial shipments in this matter, but there are four. That's really the number that I am looking at. And it is over a rather substantial period of time.

I don't find that these are the substantial meaningful contacts. I have discussed or indicated, I guess while the plaintiff was arguing, that the advertising was done, I think, under the Camelback case is also not significant.

The fact that the customers, mostly Johns–Manville, directed the defendant to send the goods to the Port of Baltimore to me is significant.

I think that when one is following the instructions of the customer to send the shipment where they are directed to send it that they have to follow the orders of the customer.

They are certainly not thinking that that is an action that they could reasonably expect that they are going to be hailed into court based on that.

And I have to say that, even if one could say that there were certain minimal contacts here, that when you get to step two, which is the constitutional reach, that I think that it falls short.

It has been pointed out that we are dealing with a company that is located in another continent, many time zones away from where we are. And the fairness of bringing them in, I think, is beyond the constitutional reach.

The court also concluded that CSR was not subject to Maryland's jurisdiction under the long-arm statute. The court issued an order granting CSR's motion to dismiss on January 8, 2007.

## DISCUSSION

### *Standard Of Review*

■ Taylor contends that the court, in limiting its consideration to the four invoices, failed to evaluate the evidence in a light most favorable to Taylor. According to Taylor, the court erred in rejecting the affidavits of Lloyd and William Gardner, observations from co-workers, and also improperly ignored evidence of other contacts, such as CSR's sugar trade and asbestos advertising in *Asbestos* magazine.

According to CSR, Taylor had to prove facts establishing jurisdiction to defeat the motion to dismiss, instead of merely adducing evidence to generate disputed facts, which would be sufficient to defeat a motion for summary judgment. CSR contends that Taylor failed to sustain her burden of proof, and the court correctly analyzed the controlling law and properly applied it to the facts of record.

■ "The defense of lack of personal jurisdiction ordinarily is collateral to the merits and raises questions of law." *Bond v. Messerman,* 391 Md. 706, 718, 895 A.2d 990 (2006). "The burden of alleging and proving the existence of a factual basis for the exercise of personal jurisdiction, once the issue has been raised, is upon the plaintiffs." *McKown v. Criser's Sales and Serv.,* 48 Md.App. 739, 747, 430 A.2d 91 (1981). Plaintiffs must establish a *prima facie* case for personal jurisdiction to defeat a motion to dismiss. *See Beyond Sys., Inc. v. Realtime Gaming Holding Co.,* 388 Md. 1, 26, 29, 878 A.2d 567 (2005). "If facts are necessary in deciding the motion, the court may consider affidavits or other evidence adduced during an evidentiary hearing." *Id.* at 12, 878 A.2d 567. Without an evidentiary hearing, courts are to consider the evidence in the light most favorable to the non-moving party when ruling on a motion to dismiss for a lack of personal jurisdiction. *See Zavian v. Foudy,* 130 Md.App. 689, 702, 747

A.2d 764 (2000). *See also Mylan Laboratories, Inc. v. Akzo, N.V.,* 2 F.3d 56, 60 (4th Cir.1993)(a plaintiff "need prove only a prima facie case of personal jurisdiction" when the court decides "a pretrial personal jurisdiction dismissal motion without an evidentiary hearing"); *Combs v. Bakker,* 886 F.2d 673, 676 (4th Cir.1989)(citing 2A Moore's Federal Practice, § 12.07 (1985 & Supp.1992–93))("[t]he burden on the plaintiff is simply to make a prima facie showing of a sufficient jurisdictional basis in order to survive the jurisdictional challenge" and the court "must construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction" when deciding a motion to dismiss on jurisdictional grounds). The circuit court did not hold an evidentiary hearing in this case and was, therefore, required to apply these standards.

We agree with Taylor that the court did not properly consider the evidence in limiting its consideration to the four invoices. In reviewing Taylor's jurisdictional claim, we consider, therefore, not only the four invoices, but also the evidence favorable to Taylor, adduced in affidavits by the Gardners, Captain Stewart, and Dr. Castleman, as well as other evidence, including evidence of CSR's sugar shipments and asbestos advertising.

### *The Dual Inquiry In Analyzing Personal Jurisdiction*

In determining whether a Maryland court may exert personal jurisdiction over a foreign defendant, we engage in a dual inquiry, considering if the exercise of jurisdiction 1) is authorized under Maryland's long arm statute, Md.Code (2006 Repl.Vol., 2007 Supp.) § 6–103 of the Courts and Judicial Proceedings Article (JP), and 2) comports with the due process requirements of the Fourteenth Amendment. *See Beyond Systems,* 388 Md. at 14–15, 878 A.2d 567. "[T]he purview of the long arm statute is coextensive with the limits of personal jurisdiction set by the due process clause of the Federal Constitution." *Id.* at 15, 878 A.2d 567. Under JP § 6–103(b), where jurisdiction is based on a cause of action arising from acts enumerated under the statutory section,

[a] court may exercise personal jurisdiction over a person, who directly or by an agent:

(1) Transacts any business or performs any character of work or service in the State;

(2) Contracts to supply goods, food, services, or manufactured products in the State;

(3) Causes tortious injury in the State by an act or omission in the State;

(4) Causes tortious injury in the State or outside of the State by an act or omission outside the State if he regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from goods, food, services, or manufactured products used or consumed in the State. . . .

 In our due process inquiry, we must determine whether the defendant has "certain minimum contacts with [Maryland] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. State of Wash., Office of Unemployment Comp. and Placement,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945) (citation omitted). We first address in personal jurisdiction cases "the nature and extent of contacts that must be shown between the forum and the defendant to satisfy the threshold demands of fairness." *Camelback Ski Corp. v. Behning,* 312 Md. 330, 336, 539 A.2d 1107, *cert. denied,* 488 U.S. 849, 109 S.Ct. 130, 102 L.Ed.2d 103 (1988). "[T]he quality and quantity of contacts required to support the exercise of personal jurisdiction will depend upon the nature of the action brought and the nexus of the contacts to the subject matter of the action." *Id.* at 338, 539 A.2d 1107.

 Cases may generally be divided into those involving general jurisdiction, in which the cause of action is unrelated to the contacts, and those involving specific jurisdiction, in which the cause of action arises out of the conduct which constitutes the contacts. *See id.* In general jurisdiction cases, plaintiffs must show that the defendant's contacts with the state are continuous and systematic to establish jurisdic-

tion. *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 416, 104 S.Ct. 1868, 1873, 80 L.Ed.2d 404 (1984). In specific jurisdiction cases, "it may be entirely fair to permit the exercise of jurisdiction to that claim" absent other continuous and systematic general business conduct. *Camelback,* 312 Md. at 338–39, 539 A.2d 1107. There are cases, however, that do not fit neatly in either category, and for these cases "the proper approach is to identify the approximate position of the case on the continuum that exists between the two extremes, and apply the corresponding standard, recognizing that the quantum of required contacts increases as the nexus between the contacts and the cause of action decreases." *Id.* at 339, 539 A.2d 1107.

Due process requires that one show in each case "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 1239–40, 2 L.Ed.2d 1283 (1958). In other words, the defendant's conduct and connection with the forum State must be such "that he should reasonably anticipate being haled into court there." *See World–Wide Volkswagen v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980).

The Supreme Court in *Asahi Metal Industry Co., Ltd. v. Superior Court of California, Solano County,* 480 U.S. 102, 112, 107 S.Ct. 1026, 1032, 94 L.Ed.2d 92 (1987), held that a California court had no jurisdiction over Asahi Metal Industry Co., Ltd. ("Asahi"), a Japanese company that manufactured tire valve assemblies in Japan and sold them to a manufacturer in Taiwan. The Taiwan manufacturer was sued in California by a person injured when he lost control of his Honda motorcycle in California. The plaintiff alleged that his cycle's tire, tube and sealant were defective. The Taiwan manufacturer cross-claimed against Asahi, and that claim was the only one at issue remaining in the case, the others having been settled and dismissed. Justice O'Connor, in a plurality opinion, wrote that the "placement of a product into the stream of commerce, without more, is not an act of the defendant

purposefully directed toward the forum State." *Id.* at 112, 107 S.Ct. at 1032. According to Justice O'Connor's opinion, one must show additional conduct indicating "an intent or purpose to serve the market in the forum State[,]" such as "designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State." *Id.* Justice Brennan, however, in a concurring opinion joined by justices Marshall, Blackmun, and White, agreed with dismissal because the exercise of personal jurisdiction over Asahi in this case would not comport with "fair play and substantial justice" under *International Shoe Co.,* 326 U.S. at 320, 66 S.Ct. at 160. *See Asahi,* 480 U.S. at 116, 107 S.Ct. at 1034.

The concurring justices did not agree with Justice O'Connor's stream-of-commerce theory, nor with the conclusion that Asahi did not "purposely avail itself of the California market." Justice Brennan and the three other justices opined that a plaintiff need not show " '[a]dditional conduct' directed toward the forum before finding the exercise of jurisdiction over the defendant to be consistent with the Due Process Clause." *See id.* at 117, 107 S.Ct. at 1034. According to Justice Brennan, Justice O'Connor's opinion constituted a "marked retreat" from the analysis in *World–Wide Volkswagen. See id.* at 118, 107 S.Ct. at 1035. The four concurring justices considered placement of a product into the stream of commerce to be sufficient, because

> [t]he stream of commerce refers to not unpredictable currents or eddies, but to the regular and anticipated flow of products from manufacture to distribution to retail sale. As long as a participant in this process is aware that the final product is being marketed in the forum State, the possibility of lawsuit there cannot come as a surprise.

*Id.* at 117, 107 S.Ct. at 1034–35.

Our Court of Appeals has adopted a three-part test, reflecting the Supreme Court's jurisprudence, for evaluating whether specific jurisdiction exists:

> [W]e consider (1) the extent to which the defendant has purposefully availed itself of the privilege of conducting activities in the State; (2) whether the plaintiffs' claims arise out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable.

*Beyond Systems,* 388 Md. at 26, 878 A.2d 567.

> [The] "purposeful availment" requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of "random," "fortuitous," or "attenuated" contacts, or of the unilateral activity of another party or a third person[.] Jurisdiction is proper, however, where the contacts proximately result from actions by the defendant *himself* that create a substantial connection with the forum State.

*Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 476, 105 S.Ct. 2174, 2183–84, 85 L.Ed.2d 528 (1985) (citations omitted and emphasis in original).

The second question we address in personal jurisdiction cases is whether an exercise of jurisdiction over a foreign defendant is fair overall, in light of the factors the Supreme Court has provided for making such an evaluation. *See Camelback,* 312 Md. at 341, 539 A.2d 1107. The Supreme Court in *Rudzewicz* explains as follows:

> Once it has been decided that a defendant purposefully established minimum contacts within the forum State, these contacts may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with "fair play and substantial justice." Thus courts in "appropriate case[s]" may evaluate "the burden on the defendant," "the forum State's interest in adjudicating the dispute," "the plaintiff's interest in obtaining convenient and effective relief," "the interstate judicial system's interest in obtaining the most efficient resolution of controversies," and the "shared interest of the several States in furthering fundamental substantive social policies."

471 U.S. 462, 476–77, 105 S.Ct. 2174, 2184, 85 L.Ed.2d 528 (1985) (citation omitted). The Supreme Court indicates that a

court's assertion of jurisdiction over a foreign national places a unique burden "upon one who must defend [itself] in a foreign legal system" and this burden "should have significant weight in assessing the reasonableness of stretching the long arm of personal jurisdiction over national borders." *See Asahi,* 480 U.S. at 114–16, 107 S.Ct. at 1033–34 (California court's exercise of personal jurisdiction over a corporation headquartered in Japan held to be unreasonable and unfair when considering "the international context, the heavy burden on the alien defendant, and the slight interests of the plaintiff and the forum State").

### Taylor's Arguments In Favor of Jurisdiction

Taylor argues that she satisfied a number of grounds for the imposition of personal jurisdiction over CSR under JP § 6–103(b). According to Taylor, she established jurisdiction under JP § 6–103(b)(1) because CSR transacted business in Maryland by utilizing the Port of Baltimore as the port of entry for its delivery of asbestos fiber to American customers. This transacted business, according to Taylor, was the direct and proximate cause of injuries sustained by Smith and Anzulis. Taylor also argues that JP § 6–103(b)(1) is satisfied because CSR shipped massive amounts of Australian raw sugar to the Port of Baltimore.

Taylor asserts additionally that she established jurisdiction under JP § 6–103(b)(2) by showing that CSR supplied goods to the state and under JP § 6–103(b)(3) by establishing that CSR caused tortious injury in Maryland in failing to satisfy its duty to warn longshoremen, specifically Smith and Anzulis, about the hazards of asbestos dust. Finally, Taylor argues that she satisfied JP § 6–103(b)(4) by showing that CSR solicited business in Maryland by advertising regularly in *Asbestos,* a national trade magazine that was circulated in Maryland. Taylor also maintains that she satisfied JP § 6–103(b)(4) by providing evidence of CSR's persistent and regular utilization of the Port of Baltimore for sugar deliveries from which CSR derived substantial revenue.

Taylor next contends that she presented evidence satisfying the due process requirements for Maryland's exercise of both specific and general personal jurisdiction over CSR. Taylor argues that she satisfied the Court's three part test in *Beyond Systems* for establishing specific personal jurisdiction. According to Taylor, she established that CSR purposefully availed itself of the privilege of conducting activities in the state with evidence showing that CSR, in shipping asbestos fiber to United States buyers, 1) agreed to transport the cargo from Australia to the Baltimore pier and 2) arranged for the services of the longshoreman, who would unload the ships in Baltimore. Taylor points out that CSR's advertising in *Asbestos* magazine also constituted purposefully directed contact with Maryland. Taylor contends that she established that Smith and Anzulis' claims arose out of CSR's activities directed at Maryland, because both were exposed injuriously to asbestos dust from CSR's intentional deliveries of asbestos fiber to Baltimore with the expectation that the asbestos would be unloaded by longshoremen.

Taylor asserts that Maryland's exercise of personal jurisdiction is constitutionally reasonable, because it was reasonably foreseeable to CSR that it could be subject to defending litigation in Maryland when it exported hazardous asbestos fiber to its ports, placing those coming in contact with it at risk of incurring actionable injury. Taylor maintains that the *Rudzewicz* factors weigh in her favor, because 1) the burden on CSR in defending the suit in Maryland is less than the burden on Taylor, were Taylor required to proceed against CSR in Australia; 2) Maryland has an interest in not only making its courts available for stevedores injured while working at the Port of Baltimore, but also insuring that the importation of hazardous materials is done in a safe manner; and 3) Maryland is the most efficient forum for resolution of this matter because of its experience in resolving asbestos personal injury cases.

Taylor maintains that she also established the requirements for general personal jurisdiction. According to Taylor, she did this by putting forward facts showing that CSR, for decades,

shipped massive amounts of Australian sugar into the Port of Baltimore and that these shipments constituted persistent and regular use of the Maryland harbor facilities.

## CSR's Arguments Against Jurisdiction

CSR contends that Taylor failed to allege facts that place CSR within reach of Maryland's long arm statute, JP § 6–103(b). According to CSR, the four invoices the court considered show that the asbestos fiber was not purchased by, or delivered to, a Maryland manufacturer. Merely removing bags of fiber from the holds of freighters at the Port, it asserts, does not constitute transacting business or supplying goods to the state. CSR also maintains that Taylor has failed to show that CSR was ever present in the state to cause tortious injury, regularly conducted business, engaged in a persistent course of conduct, or derived substantial revenue from products used in Maryland. According to CSR, all of CSR's activities concerning shipments of fiber started and ended in Australia.

Responding to Taylor's claim that the evidence supports Maryland's specific personal jurisdiction over it, CSR argues that the four invoices do not establish that CSR had any role in the selection of the Port of Baltimore as the transfer point for the delivery of asbestos fiber shipments to United States purchasers. Thus, it argues, the invoices do not show that CSR purposefully availed itself of the protection of Maryland's laws. CSR dismisses the deliveries earmarked for Baltimore at the time of embarkation as mere "serendipity" and not "purposeful availment."

CSR maintains that Taylor, at most, can argue that some CSR-shipped bags of asbestos fiber, at the direction of a third-party, may have been unloaded at the Port of Baltimore. CSR argues that Taylor's assertion is tantamount to the one rejected by the *Asahi* Court that mere placement of a product in the stream of commerce sufficiently shows an act purposefully directed toward the forum State.

According to CSR, the *Rudzewicz* factors do not support Maryland's exercise of specific jurisdiction over it, because 1) requiring CSR to defend itself in Maryland would be onerous, given that its principal place of business is in Sydney, Australia; 2) dismissal is not burdensome on Taylor since she can pursue her claims against the buyers of the cargo which are located in the United States; 3) Maryland has little interest in adjudicating a dispute involving CSR, a defendant with whom it has no connection, and its assertion of jurisdiction would discourage other corporations from conducting business in the State; and 4) Maryland's exertion of jurisdiction would interfere with the conduct of international relations, since CSR is a corporation with close ties to the Australian government.

Finally, CSR argues that Taylor has failed to prove facts supporting general jurisdiction as well. According to CSR, the affidavits from the longshoremen showed that CSR only had random, fortuitous, or attenuated contacts. Lloyd Gardner indicated that he only unloaded bags stamped with a CSR logo up to six times a year in the 1950s and 1960s. CSR also argues, citing *Camelback*, 312 Md. at 341–43, 539 A.2d 1107, that the magazine advertisements cannot support general jurisdiction, because they were not directed specifically to Maryland customers. CSR maintains that Taylor has failed to show, in Maryland Port Authority documents, that CSR was marketing and arranging the sale and shipment of bulk raw sugar to Baltimore. CSR also contends that any of its sugar marketing activities took place in Australia at the direction and control of the government and there is no evidence that CSR had any sugar facilities, personnel, accounts, telephones, or any other nexus to Maryland.

### Court's Analysis

We conclude that Taylor presented facts establishing CSR contacts with Maryland sufficient to confer personal jurisdiction under the Due Process Clause. Because Maryland's "long arm statute represents an effort by the Legislature to expand the boundaries of permissible in personam jurisdiction to the limits permitted by the Federal Constitu-

tion[,]" *see Geelhoed v. Jensen,* 277 Md. 220, 224, 352 A.2d 818 (1976), Taylor established Maryland's jurisdiction over CSR under the long arm statute by fulfilling the requirements of constitutional due process. In *Beyond Systems,* 388 Md. at 22, 878 A.2d 567, the Court of Appeals merged its statutory inquiry with its constitutional examination, due to the "coextensive" reach of the long arm statute to "the limits of personal jurisdiction delineated under the due process clause[.]" We apply the same approach here.

As we mentioned earlier, the Court of Appeals in *Camelback* explained that a case need not fit neatly in either the category of specific or general jurisdiction:

> The concept of specific and general jurisdiction is a useful tool in the sometimes difficult task of detecting how much contact is enough, and most cases will fit nicely into one category or the other. If, however, the facts of a given case do not naturally place it at either end of the spectrum, there is no need to jettison the concept, or to force-fit the case. In that instance, the proper approach is to identify the approximate position of the case on the continuum that exists between the two extremes, and apply the corresponding standard, recognizing that the quantum of required contacts increases as the nexus between the contacts and the cause of action decreases.

312 Md. at 339, 539 A.2d 1107.

Taylor presented evidence that the cause of action arose from CSR's direct shipment of asbestos to the Port of Baltimore, where Smith and Anzulis were stevedores, and expert testimony that CSR would reasonably expect that its cargo of asbestos would be unloaded by stevedores at the port, who could be exposed to the asbestos if the burlap bags were ripped. Taylor also presented evidence that CSR had other contacts with Maryland unrelated to Smith's or Anzulis' injuries, when they advertised regularly in a United States asbestos industry magazine. CSR also marketed and arranged all Australian exports of sugar and, from 1964 to 1966, $66.5

million dollars worth of sugar (in 2005 dollars) arrived at the Port of Baltimore from Australia.

We conclude that this case is one that falls on the continuum between the two extremes of specific and general jurisdiction. *See Camelback*, 312 Md. at 339, 539 A.2d 1107. We agree with Taylor that the four invoices, indicating CSR's asbestos shipments from Australia to the Port of Baltimore during the period of time in which Smith and Anzulis worked as longshoremen, evidenced CSR's conduct in which it purposefully availed itself of the privilege of conducting activities in the State. *See Beyond Systems*, 388 Md. at 26, 878 A.2d 567. In Captain Stewart's affidavit, he indicated that three of the four invoiced shipments were made pursuant to "C.&.F./C.I.F." shipping contracts, in which CSR, as the "seller/shipper/consignor" of the asbestos fiber, was obligated to package the cargo, identifying the contents and port destination; prepare an invoice; contract for marine insurance; obtain necessary shipping documents; and pay all freight charges to the carrier, including costs associated with hiring a stevedore company to unload the cargo. According to Stewart, the shipments weighed over 1.2 million pounds, consisting of 13,332 individual bags of asbestos fiber. The shipping agreements, according to Stewart, also provided CSR with access to Maryland courts in the event that its shipments were not accepted upon delivery.

In *Kopke v. A. Hartrodt S.R.L.*, 245 Wis.2d 396, 629 N.W.2d 662, 666–67 (2001), a court was presented with an analogous shipping scenario in which a Wisconsin truck driver was injured when a pallet loaded with paper fell on him while he was unloading an ocean-going container that had been negligently packed by an Italian loading company. The *Kopke* court concluded that Wisconsin's exercise of personal jurisdiction complied with the limits of due process because the cargo "was introduced into the stream of commerce with the expectation that it would arrive in [the] forum." *See id.* at 675.

The *Kopke* court considered a stream of commerce analysis applicable because the truck driver's injuries "arose out of commercial activities and the distribution of goods in the

stream of commerce" and "the facts . . . present[ed] a 'regular course of dealing that result[ed] in deliveries' of multiple units of the product into [the] forum over a period of years." The court determined that personal jurisdiction was proper based upon the shipper's contractual relationship with the manufacturer; loading instructions that identified the container's destination as "Neenah" or "CTI Appleton[,]" the place of injury; damage reports demonstrating that at least 40 containers were loaded by the shipping company workers for delivery to the forum; and a regular business arrangement with the manufacturer benefitting the shipping company. *See id.* at 675–76. With regard to the loading instruction identifying the container's destination, the court concluded that "these products did not randomly or fortuitously appear in Wisconsin; they were specifically intended to arrive in [the] forum. The injury that [the truck driver] suffered occurred in the forum to which the cargo containers were directed to arrive." *See id.* at 675.

The *Kopke* court concluded that these facts were sufficient to satisfy the purposeful availment requirement. The court also determined that the shipping company had sufficient minimum contacts with the forum to be held accountable if any negligence on its part in loading the cargo containers had resulted in damages. *See id.* at 676.

We believe that CSR's packaging and shipping of asbestos, during which it identified the contents and port destination of Baltimore, is tantamount to the kind of purposeful distribution of goods that the *Kopke* court concluded supported a finding of sufficient minimum contacts. Taylor's and Anzulis' injuries are alleged to be, among other causes, attributable to CSR's negligent packaging/shipping of the asbestos product, as were the injuries to the plaintiff in *Kopke.*

As in *Kopke,* there is also documentation of a shipment of considerable size, specifically, 13,332 bags of asbestos fiber. The shipping invoices also indicate "Baltimore" as the port of entry, just as the loading instructions indicated the shipping destination in *Kopke.* The shipping invoices correspond with

the period of time that Smith and Anzulis worked as steve-
dores at the Port, and Gardner, a co-worker, indicated that he
unloaded thousands of burlap bags containing asbestos, includ-
ing some with CSR's logo. According to Dr. Castleman, CSR
would have known that its bags were handled and unloaded by
longshoremen at various ports.

Also relevant is the substantial economic benefit CSR de-
rived from its asbestos shipments that were unloaded at the
Port and sent on to purchasers in the United States. Accord-
ing to Dr. Paige, the cumulative value of the four invoiced
shipments of asbestos was over $100,000 in the 1950s and
1960s, which valued today would be over $1,000,000. Although
the asbestos may have been delivered, ultimately, to locations
outside of Maryland, such as Johns–Manville in New York,
CSR's use of the Port and stevedores like Smith and Anzulis
was an essential component in fulfilling its commercial agree-
ments.

Our conclusion that the "minimum contacts" standard has
been met is not inconsistent with Maryland law. In *Camel-
back*, 312 Md. at 340, 539 A.2d 1107, the Court of Appeals
discussed the type of placement in the stream of commerce
that will support personal jurisdiction:

> In the context of determining what is fair for purposes of
> jurisdiction, a significant difference exists between regularly
> placing goods into a stream of commerce with knowledge
> they will be sold in another state on the one hand, and
> knowingly accepting the economic benefits brought by inter-
> state customers on the other hand. Ordinarily, one who
> purposefully sends a product into another jurisdiction for
> purposes of sale may reasonably expect to be haled into
> court in that State if the product proves to be defective and
> causes injury there. In addition to having caused a direct
> injury within the forum State, that manufacturer or distrib-
> utor has purposefully availed himself of the laws of the
> forum State that regulate and facilitate such commercial
> activity. The same cannot be said of the fixed-side mer-
> chant who is simply aware that a portion of his income

regularly is derived from the patronage of customers coming from other states.

The *Camelback* Court concluded that a Pennsylvania ski resort did not have sufficient contacts with Maryland to establish personal jurisdiction. *Id.* at 332–33, 539 A.2d 1107. The ski resort was aware that others were publicizing the resort in the Baltimore and Washington metropolitan areas, that wire services and newspapers routinely reported information about slope conditions, that Maryland residents could and were using a toll-free number for information about its slopes, and that a small number of brochures were occasionally requested by Maryland ski shop owners. The resort, however, "did not devote its energy or financial resources to the marketing of Maryland." *Id.* at 341–43, 539 A.2d 1107. The Court concluded that the resort's conduct did not "mount up to the 'purposeful availment' of the benefits or laws of this State that will satisfy the threshold test of minimum contacts mandated by the Due Process Clause," nor was the resort's conduct "such that it could have expected to be haled into the courts of Maryland" for a negligence claim involving a serious injury sustained while skiing. *Id.* at 342–43, 539 A.2d 1107.

Unlike Camelback ski resort, CSR's asbestos shipments are examples of purposeful directing of product to Maryland. In shipping the asbestos to the Port of Baltimore, to be first unloaded before being sent on for sale elsewhere, CSR did not just knowingly accept the benefit that would be brought through an interstate distribution of goods. CSR, instead, purposefully sent asbestos into Maryland with an expectation that it would be handled by Maryland stevedores. By doing so, CSR might reasonably have expected to be haled into court in Maryland if its asbestos shipments proved to be dangerously packaged, causing injury to the stevedores in Maryland. This does not mean, necessarily, that Maryland would have jurisdiction over a suit brought by a person who happened to be near the place where the stevedores were unloading the asbestos. Nor does it mean that Maryland would have jurisdiction in suits brought by other Maryland residents claiming injury from asbestos. The case for jurisdiction when the

stevedores or their representatives are plaintiffs has the additional and significant factor that CSR knew when it shipped the asbestos that stevedores would unload the bags.

CSR's marketing in Asbestos magazine, although not sufficient by itself, is also a contact that can be considered in our determination. We do not agree with CSR that *Camelback* renders meaningless CSR's advertising in this magazine. We read *Camelback* to say simply that the ski resort's passive awareness of promotional activities directed by others in Maryland was not, by itself, sufficient to survive the minimum contacts test. *See id.* at 341, 539 A.2d 1107. Here, we consider the magazine advertising, but do not accord it much weight.

CSR asserts that our denial of personal jurisdiction in *Hollingsworth & Vose Co. v. M.P. Connor*, 136 Md.App. 91, 114–15, 764 A.2d 318 (2000), counsels our denial of jurisdiction here. In *Connor*, a smoker brought a products liability action in Maryland against Hollingsworth & Vose Co. ("H & V"), which manufactured cigarettes and cigarette filters, to recover for mesothelioma allegedly caused by exposure to asbestos in the filters. We disagree with CSR, as we view the defendant cigarette filter manufacturer's actions to be considerably less directed toward Maryland than CSR's shipments:

> As in *Asahi*, H & V in the case at bar has done nothing that would subject it to personal jurisdiction under the minimum contacts standard. H & V manufactured its filters in Massachusetts, it did not maintain an office in Maryland, ***it did not ship its filters to Maryland,*** it does not appear from the record that it designed or manufactured its filters specifically for the Maryland market, ***nor did it advertise or market its filters in Maryland.*** The evidence shows that H & V distributed its filter material to Lorillard's plants in Kentucky and New Jersey and that H & V had no involvement with the manufacture of Kent cigarettes, ***nor any control over their sale and distribution.***

*Id.* at 114, 764 A.2d 318 (emphasis added).

In light of CSR's directed shipments of asbestos and its marketing efforts, plus its other contacts with Maryland asso-

ciated with its sugar trade, CSR purposefully availed itself of the privilege of conducting activities in the State. Gardner indicated that he unloaded asbestos bags, including bags marked with CSR's label, with Smith and Anzilus, and that these bags would produce dust. This dust is alleged to be the cause of Smith's and Anzilus' mesothelioma. These facts favor personal jurisdiction with regard to the first two parts of the Court's test for specific jurisdiction. *See Beyond Systems*, 388 Md. at 26, 878 A.2d 567. These facts also distinguish this case from *Asahi*.

With regard to the third part of the test in *Beyond Systems*, and applying the *Rudzewicz* reasonableness factors, we believe that the exercise of personal jurisdiction, under the circumstances, would be constitutionally reasonable. *See id.* Maryland has an interest in providing its longshoremen citizens with a forum to adjudicate claims that arise out of activities at the Port. Taylor and Fuchsulger, on behalf of Smith and Anzulis, also have an interest in obtaining convenient relief for the mesothelioma that Smith and Anzulis contracted as a result of their exposure to asbestos fiber. Indeed, it would be unreasonable to expect longshoremen at the Port of Baltimore to bring their claims for injuries in far away countries like Australia or the various possible final destination states for a multitude of products that pass through the Port.

Having to defend in Maryland is probably burdensome for CSR as an Australian corporation. We recognize that we are to give "significant weight" to the "unique burdens placed upon one who must defend oneself in a foreign legal system." *Asahi*, 480 U.S. at 114, 107 S.Ct. at 1033. Unlike *Asahi*, however, where the plaintiff was not a resident of the forum state, the injured persons here were citizens of Maryland. Indeed, they are citizens providing a service, without which the Port of Baltimore could not operate. Thus, stevedores have an important economic impact on the state. Accordingly, the plaintiffs' interest and Maryland's interest are not slight, but instead, justify an exercise of jurisdiction despite the

serious burdens placed on CSR. *See id.* ("When minimum contacts have been established, often the interests of the plaintiff and the forum in the exercise of jurisdiction will justify even the serious burdens placed on the alien defendant.").

### *Conclusion*

Viewing the facts presented in the light most favorable to Taylor, we conclude that Taylor established sufficient minimum. and purposeful CSR contacts with Maryland satisfying the personal jurisdiction requirements of Md.Code § 6–103 and the Due Process Clause.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY REVERSED; CASE REMANDED FOR FURTHER PROCEEDINGS IN ACCORDANCE WITH THIS OPINION; COSTS TO BE PAID BY APPELLEE.**