983 A.2d 492

**CSR, LIMITED**

v.

**Andrea TAYLOR, et al.**

**No. 129, Sept. Term, 2008.**

Court of Appeals of Maryland.

Nov. 16, 2009.

458

F. Ford Loker (Laura A. Cellucci, Miles & Stockbridge, P.C., Baltimore), on brief, for Petitioner.

Edward J. Lilly (Steven W. Smith, Jennifer L. Lilly, Law Offices of Peter G. Angelos, Baltimore), on brief, for Respondents.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, JOHN C. ELDRIDGE (Retired, Specially Assigned) and IRMA S. RAKER (Retired, Specially Assigned), JJ.

GREENE, J.

This case requires us to determine whether the Circuit Court for Baltimore City would have been justified in exercising *in personam* jurisdiction over Petitioner, Colonial Sugar Refining Co., Ltd. ("CSR"), an Australian business entity, under the circumstances presented in this case. Andrea Taylor and Mary Fuchsluger (collectively, "Respondents") are the personal representatives of the estates of two former

stevedores who worked at the Port of Baltimore ("Port") and who allegedly contracted mesothelioma from the offloading of raw asbestos and asbestos-containing products. Respondents attribute the stevedores' illnesses, in part, to CSR's use of the Port as a conduit in shipping raw asbestos fibers from Australia to United States consumers located outside of Maryland.

To properly assert jurisdiction over CSR, a foreign corporation, Petitioner's actions must satisfy the requirements set forth in Maryland's long-arm statute, Md.Code (1974, 2006 Repl.Vol.), § 6–103 of the Courts & Judicial Proceedings Article, and the exercise of jurisdiction must comply with the Due Process Clause of the Fourteenth Amendment. With respect to the Due Process Clause, which overall requires that Petitioner have maintained sufficient minimum contacts with the forum state, there must be "purposeful availment," meaning there exists so substantial a connection between Petitioner and the forum state that having to defend a lawsuit there would be foreseeable. In Maryland, a substantial connection will be established if Petitioner either engaged in significant activities in the State or created continuing obligations with the State's residents, thus taking advantage of the benefits and protections of Maryland law. In the instant case, however, Respondents have failed to demonstrate that CSR, in the course of any of its contacts with Maryland, satisfied the "purposeful availment" requirement. Thus, we shall hold that the Court of Special Appeals erred in concluding that the Circuit Court had jurisdiction over CSR.

## I.

Respondents are the personal representatives of the estates of Alfred B. Smith and Joseph Anzulis. Smith and Anzulis worked as stevedores at the Port from approximately 1942 through 1983 and 1937 through 1973, respectively. Each man died from mesothelioma,[1] which Respondents contend was caused by exposure to asbestos while working at the Port.

---

1. In *Owens–Illinois, Inc. v. Cook*, 386 Md. 468, 872 A.2d 969 (2005), this Court described mesothelioma:

In the Circuit Court for Baltimore City, Respondents sued numerous entities involved in the manufacture, supply, sale, distribution, and installation of asbestos-containing products, alleging multiple causes of action, including strict liability, breach of warranty, negligence, and fraud. Respondents' theory was that Smith and Anzulis became sick from the offloading of raw asbestos or asbestos-containing products from ships docked at the Port.

One of the entities Respondents sued was CSR, a corporation organized and existing under the laws of Australia. CSR's headquarters and principal place of business is in Chatsworth, New South Wales, Australia, located approximately 10,000 miles and a 14–hour time difference from Maryland. Between approximately 1943 and 1966, CSR acted as the exclusive distributor for a wholly-owned subsidiary, Australian Blue Asbestos Pty. Limited ("ABA"), to sell asbestos mined in Wittenoom, Western Australia, to customers in the United States. Although CSR's customers were located outside of Maryland, some of the corporation's shipments passed through the Port, where they were offloaded by stevedores and forwarded via other conveyances to their final destinations.

In an affidavit submitted to the Circuit Court, Lloyd M. Gardner, Sr., a co-worker of Smith and Anzulis at the Port,

---

The National Cancer Institute defines Mesothelioma as a disease in which cancer (malignant) cells are found in the sac lining the chest (the pleura) or abdomen (the peritoneum). This is a rare form of cancer and most people with malignant mesothelioma have worked on jobs where they breathed asbestos. *National Cancer Institute, Questions and Answers, Cancer Facts 6.36–Mesothelioma* (May 13, 2002).

We have also described the disease of mesothelioma, "as a malignant tumor that forms in the body cavities, predominantly the thoracic and abdominal cavities. In the thoracic cavity, it directly invades and encases the pleura—the outside lining of the lung—and eventually occupies and eradicates the pleural space. It frequently will grow into the lung and, over time, can metastasize to other structures, including the diaphragm and the abdominal cavity." *John Crane, Inc. v. Scribner*, 369 Md. 369, 378–379, 800 A.2d 727, 732 (2002). 386 Md. at 474–75 n. 4, 872 A.2d at 972–73 n. 4.

stated that he unloaded thousands of burlap bags shipped from foreign ports and containing raw asbestos. Gardner recalled unloading shipments of Australian asbestos up to approximately six times per year in the 1950s and 60s. The bags comprising these shipments, Gardner noted, contained a diamond-shaped logo with the letters "CSR."

In addition, Lloyd Gardner testified at his deposition that the offloading of asbestos-containing bags at the Port produced a lot of dust. He also said, in his affidavit, "Handling the bags of CSR asbestos was very dusty, and at times the bags would be punctured or ripped which also created dust which I and the other workers in the area breathed." Gardner remembered Smith and Anzulis being present when the dust-producing work took place.

William Gardner, Lloyd Gardner's brother and a stevedore who worked at the Port from 1961 until 1970, also indicated in a deposition that he recalled unloading CSR-labeled burlap bags containing raw asbestos. William Gardner further stated that dust would be "all over the place," and that Smith and Anzulis were present during these unloading jobs.

Beyond supplying raw asbestos to American consumers, CSR was involved in the sugar industry. For decades, including the years when Smith and Anzulis worked at the Port, CSR had an agreement with the State of Queensland, Australia, to market all Australian exports of raw sugar. CSR's duties included making arrangements for sale, transport, insurance, and financing, and CSR performed those duties pursuant to the Sugar Acquisition Act of 1915, by which the Australian government directed all facets of sugar production and distribution. Baltimore served as a significant point of entry for imports of Australian sugar, as Maryland Port Authority statistics indicate that approximately 82,847 tons of raw sugar, then-valued at $10,921,373, were imported into the Port from Australia during the period from 1964 through 1966.

In response to Respondents' lawsuit, CSR filed a motion to dismiss for lack of personal jurisdiction. In an affidavit filed in support of the motion, Edwin Anthony Smith, manager of CSR's Group Financial Reporting, provided the following

reasons for challenging the jurisdiction of a Maryland court: (1) CSR never conducted or solicited any business in Maryland; (2) CSR was never incorporated or licensed to do business in Maryland; (3) CSR never appointed an agent for the purpose of accepting service of process in Maryland; and (4) CSR never maintained an office, telephone listing, mailing address, or bank account in Maryland, nor did it own, lease, or possess an interest in property in the State. Pertaining to CSR's supply of asbestos specifically, Smith asserted that CSR never conducted an asbestos-related business in Maryland, nor had the company been a party to a contract in the State or been required to perform a contract in the State. Smith further stated that CSR had never manufactured, produced, merchandised, marketed, supplied, distributed, sold, or installed asbestos products in Maryland. According to Smith, the purchaser of the raw asbestos was "basically responsible for it" when it left Australia, and where the shipment went "was dictated by the purchaser."[2]

In opposition to CSR's motion to dismiss, Respondents presented to the Circuit Court four invoices representing asbestos shipments by CSR to Baltimore during the period when Smith and Anzulis worked as stevedores.[3] The cumula-

---

2. Respondents take issue with Smith's affidavit, contending that Smith's statements were not based upon his own personal knowledge of the events. From Smith's deposition testimony, taken on November 30, 2005, Respondents conclude that Smith's statements are attributable to a conversation between Smith and Keith Osborne Brown, a CSR executive, and a conversation between Smith and CSR's legal counsel. Smith also indicated in his deposition that he had not seen a contract between CSR and any of its customers, nor did he have expertise in maritime shipments or maritime law. We need not accord Respondents' contention any weight in this case, as Respondents carry the burden to establish the propriety of personal jurisdiction. *See Beyond v. Realtime*, 388 Md. 1, 12, 878 A.2d 567, 574 (2005); *Zavian v. Foudy*, 130 Md.App. 689, 692–93, 747 A.2d 764, 766 (2000) (" 'The burden of alleging and proving the existence of a factual basis for the exercise of personal jurisdiction, once the issue has been raised, is upon the [plaintiff].' " (quoting *McKown v. Criser's Sales & Service*, 48 Md.App. 739, 747, 430 A.2d 91, 97 (1981))).

3. The shipping invoices included one addressed to Johns–Manville Corporation in 1956, another addressed to Huxley Development Corpo-

tive weight of the shipments was over 1.2 million pounds, consisting of 13,332 individual bags of raw asbestos.[4]

Also in opposition to CSR's motion, Respondents submitted the affidavit of Captain Robert Stewart, a maritime expert. Captain Stewart observed that three of the four invoiced shipments were made pursuant to C.I.F. ("Cost, Insurance, and Freight") arrangements.[5] Captain Stewart expressed the opinion that, pursuant to the three C.I.F. arrangements, CSR, as the "seller/shipper/consignor" of the raw asbestos, was obligated to do the following: (1) package and mark the goods, identifying the contents and destination; (2) prepare an invoice; (3) contract for marine insurance; (4) obtain the necessary shipping documents, such as export licenses; (5) pay all freight charges to the carrier, including costs associated with hiring a stevedore company to unload the cargo; (6) obtain a clean negotiable bill of lading covering the transportation to Baltimore; and (7) retain responsibility for the cargo until it arrived and was unloaded in Baltimore, at which time the buyer accepted the cargo. Stewart further indicated that, under a C.I.F. contract, CSR would have access to Maryland courts if the buyers wrongly failed to accept the goods upon delivery in Baltimore. Lastly, Respondents placed into evidence the affidavit of Dr. Barry Castleman, an environmental

---

ration in 1963, and two addressed to Orangeburg Manufacturing Company in 1964 and 1965. Each of these buyers was located in New York, rather than Maryland.

4. In an affidavit submitted to the Circuit Court by Respondents, Dr. Jerome Paige, an economist, indicated that the cumulative value of the four shipments was over $100,000 in the 1950s and 60s, now worth over $1,000,000.

5. Originally, the three shipments were made pursuant to "C. & F." agreements, short for "Cost and Freight." According to Captain Stewart, however, CSR prepaid marine insurance for these shipments, thus rendering the "C. & F." agreements "C.I.F." agreements.

The fourth invoice represented an F.O.B. ("Free on Board") arrangement. In contrast to a C.I.F. agreement, Captain Stewart explained that the F.O.B. agreement terminated CSR's responsibilities for the shipment of the cargo once the cargo was placed in the possession of the carrier in Australia, the point of embarkation.

consultant with expertise concerning the history of the asbestos industry. Dr. Castleman noted that from 1943 to 1966, CSR would have known that the asbestos-containing burlap bags shipped from ABA's mine in Western Australia were handled and unloaded by stevedores at various ports and that the bags would break or tear in such a manner as to expose the stevedores to airborne asbestos. Dr. Castleman also expressed the opinion that CSR became aware of the health hazards associated with asbestos dust some time in the 1940s.

Dr. Castleman further stated that from approximately 1942 to 1966, CSR regularly advertised the sale of ABA asbestos products in *Asbestos*, a trade magazine of the United States asbestos industry published by a Pennsylvania company. Specifically, from 1954 until 1960, CSR placed advertisements in the publication every other month. Dr. Castleman expressed the opinion that CSR would have known that its advertisements reached certain potential consumers in Maryland, such as Porter Hayden and Wallace & Gale, Baltimore insulation contractors.

On November 2, 2006, the Circuit Court heard oral argument on CSR's motion to dismiss. From the bench, the motions' judge concluded, tentatively, that CSR lacked sufficient minimum contacts with Maryland to satisfy due process concerns:

> So the minimum contacts that are necessary to be shown, four invoices in this Court's opinion, at least, do not indicate any meaningful contact with the State of Maryland such that one could say that this indicates that they would anticipate that the defendant could anticipate that he would be hailed into court in this State.
>
> I know that the plaintiff says that it is not just four invoices, that there were substantial shipments in this matter, but there are four. That's really the number that I am looking at. And it is over a rather substantial period of time.
>
> I don't find that these are the substantial meaningful contacts. I have discussed or indicated, I guess while the

plaintiff was arguing, that the advertising was done, I think, under the *Camelback*[6] case is also not significant.

The fact that the customers, mostly Johns–Manville, directed the defendant to send the goods to the Port of Baltimore to me is significant.

I think that when one is following the instructions of the customer to send the shipment where they are directed to send it that they have to follow the orders of the customer.

They are certainly not thinking that that is an action that they could reasonably expect that they are going to be hailed into court based on that.

And I have to say that, even if one could say that there were certain minimal contacts here, that when you get to step two, which is the constitutional reach, that I think that it falls short.

It has been pointed out that we are dealing with a company that is located in another continent, many time zones away from where we are. And the fairness of bringing them in, I think, is beyond the constitutional reach.

On January 8, 2007, the Circuit Court entered an order granting CSR's motion to dismiss for lack of personal jurisdiction.[7]

Respondents appealed the decision of the Circuit Court to the Court of Special Appeals, which reversed the judgment below. *See Taylor v. CSR,* 181 Md.App. 363, 956 A.2d 754

---

**6.** *See Camelback Ski Corp. v. Behning (Camelback II),* 312 Md. 330, 539 A.2d 1107 (1988).

**7.** At the November 2, 2006 hearing, while tentatively concluding that the exercise of jurisdiction over CSR would offend due process, the Circuit Court deferred a final ruling on the motion to dismiss to allow Respondents the opportunity to provide additional facts or legal arguments demonstrating CSR's contacts with Maryland. CSR filed a motion for reconsideration as to the court's decision to defer judgment, and Respondents filed no opposition thereto. On January 8, 2007, the court heard argument on CSR's motion for reconsideration and clarified its ruling of November 2, 2006. Specifically, the court stated that it had "found in favor of the defendant" on CSR's motion to dismiss, and "made it clear that [the court] found no basis for personal jurisdiction."

(2008). Relying in part on an opinion of the Wisconsin Supreme Court, *Kopke v. A. Hartrodt S.R.L.*, 245 Wis.2d 396, 629 N.W.2d 662 (2001), while maintaining that its decision was "not inconsistent Maryland law," the intermediate appellate court held that CSR's packaging and shipping of asbestos to the Port was sufficient to establish such minimum contacts with Maryland as to render lawful the Circuit Court's exercise of jurisdiction. *Taylor*, 181 Md.App. at 385–86, 956 A.2d at 766–67. CSR filed a petition for writ of certiorari with this Court, and we granted CSR's petition to answer the following questions:

(1) Did the Court of Special Appeals' opinion err in holding that CSR, Limited had sufficient contacts in the State of Maryland to support the exercise of personal jurisdiction?

(2) Did the Court of Special Appeals' opinion err in holding that exercise of personal jurisdiction over CSR, Limited would not offend traditional notions of fair play and substantial justice?

## II.

### Standard of Review

The Circuit Court granted CSR's motion to dismiss for lack of personal jurisdiction. A motion to dismiss for lack of personal jurisdiction is made pursuant to Md. Rule 2–322(a) ("Preliminary motions"), which provides:

(a) **Mandatory.** The following defenses shall be made by motion to dismiss filed before the answer, if an answer is required: (1) lack of jurisdiction over the person.... If not so made and the answer is filed, these defenses are waived.

In addition, "[t]he defense of lack of personal jurisdiction ordinarily is collateral to the merits and raises questions of law." *Bond v. Messerman*, 391 Md. 706, 718, 895 A.2d 990, 997 (2006) (citing *Beyond v. Realtime*, 388 Md. 1, 11–12, 878 A.2d 567, 573–74 (2005)). If factual determinations are necessary in deciding the motion, the court may consider affidavits or testimony taken in connection with any hearing. PAUL V. NIEMEYER & LINDA SCHUETT, MARYLAND RULES COMMENTARY 205

(3d ed.2003); *see also Beyond,* 388 Md. at 12 n. 10, 878 A.2d at 574 n. 10 ("This [standard of review] contrasts with the effect of the trial court's consideration of matters outside the pleadings on a motion to dismiss for failure to state a claim upon which relief may be granted under Maryland Rule 2–322(b)." (citing NIEMEYER, *supra,* at 205)).

With respect to this Court's role in reviewing a ruling on a motion to dismiss for lack of personal jurisdiction, we stated in *Bond* that:

> [t]he applicable standard of appellate review of the grant of a motion to dismiss for lack of personal jurisdiction is whether the trial court was legally correct in its decision to dismiss the action.... *See Beyond Systems, Inc.,* 388 Md. at 12–29, 878 A.2d at 574–84 (considering the evidence presented to the trial court regarding minimum contacts of the defendant company with Maryland and concluding that the trial court properly determined that the plaintiff had failed to establish a *prima facie* case for personal jurisdiction over the defendants); *Jason Pharmaceuticals, Inc. v. Jianas Bros. Packaging Co., Inc.,* 94 Md.App. 425, 431–34, 617 A.2d 1125, 1128–30 (1993) (considering the evidence relevant to a determination of whether the defendant business had transacted business in Maryland under § 6–103(b)(1) of the long-arm statute and holding that the trial court erred when it concluded that the plaintiff had not transacted business in Maryland by negotiating and entering into one contract for sale with a Maryland company).

391 Md. at 718–19, 895 A.2d at 998.

## *Discussion*

Determining whether a Maryland court may exercise jurisdiction over an out-of-state defendant entails dual considerations. First, we consider whether the requirements of Maryland's long-arm statute [8] are satisfied. *Bond,* 391 Md. at 721,

---

8. Maryland's long-arm statute provides, in pertinent part:
 **§ 6–103. Cause of action arising from conduct in State or tortious injury outside State**

895 A.2d at 999; *Mackey v. Compass,* 391 Md. 117, 129, 892 A.2d 479, 486 (2006); *Beyond,* 388 Md. at 14, 878 A.2d at 576; *Lamprecht v. Piper Aircraft Corp.,* 262 Md. 126, 130, 277 A.2d 272, 275 (1971). Second, we consider whether the exercise of personal jurisdiction comports with the requirements imposed by the Due Process Clause of the Fourteenth Amendment.[9] *Bond,* 391 Md. at 721, 895 A.2d at 999; *Beyond,* 388 Md. at 15, 878 A.2d at 575; *Lamprecht,* 262 Md. at 130, 277 A.2d at 275. Nevertheless, "[w]e have construed our long-arm statute to authorize the exercise of personal jurisdiction to the full extent allowable under the Due Process Clause." *Bond,* 391 Md. at 721, 895 A.2d at 999. In the case *sub judice,* CSR argues that the Circuit Court did not err in holding that a Maryland court could not justifiably exercise personal jurisdiction over CSR. CSR contends initially that there is no basis to confer jurisdic-

---

(a) *Condition.*—If jurisdiction over a person is based solely upon this section, he may be sued only on a cause of action arising from any act enumerated in this section.

(b) *In general.*—A court may exercise personal jurisdiction over a person, who directly or by an agent:

(1) Transacts any business or performs any character of work or service in the State;

(2) Contracts to supply goods, food, services, or manufactured products in the State;

(3) Causes tortious injury in the State by an act or omission in the State;

(4) Causes tortious injury in the State or outside of the State by an act or omission outside the State if he regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from goods, food, services, or manufactured products used or consumed in the State;

(5) Has an interest in, uses, or possesses real property in the State; or

(6) Contracts to insure or act as surety for, or on, any person, property, risk, contract, obligation, or agreement located, executed, or to be performed within the State at the time the contract is made, unless the parties otherwise provide in writing.

Md.Code (1974, 2006 Repl.Vol.), § 6–103 of the Courts & Judicial Proceedings Article.

**9.** The Due Process Clause of the Fourteenth Amendment to the United States Constitution provides that "[n]o State shall ... deprive any person of life, liberty, or property, without due process of law...." U.S. Const. amend XIV, § 1.

tion under the State's long-arm statute. According to CSR, there is no "evidence of CSR's 'presence' in Maryland causing a tortious injury in Maryland, regularly conducting business, engaging in a persistent course of conduct or deriving substantial revenue from products used in the State of Maryland." CSR also contends that the exercise of jurisdiction by a Maryland court would offend due process. In regard to the due process issue, CSR makes two points: first, that the company does not have sufficient minimum contacts with Maryland because it never purposefully directed its goods toward the State; second, that being required to defend itself in a Maryland court would impose a fundamental unfairness upon CSR as a foreign corporation.

In contrast to CSR's position, Respondents contend that CSR satisfies a number of the grounds for the imposition of jurisdiction set forth in Maryland's long-arm statute:

Section (b)(1) is satisfied because CSR transacted business in the State of Maryland by utilizing the Port of Baltimore as the port of entry for its delivery of asbestos fiber and raw sugar to its American customers. . . .

Section (b)(1) is also satisfied by the fact that CSR, for an extended period of time, including the years when Plaintiffs were exposed to CSR asbestos fiber, shipped massive amounts of Australian raw sugar to the Port of Baltimore. . . .

Section (b)(2) is also satisfied under the facts presented which show that CSR supplied goods to the [S]tate. . . .

Section (b)(3) is satisfied as well. When the ships arrived in the Port of Baltimore, containing thousands of burlap bags of asbestos labeled with CSR's logo and Baltimore designated as the port of destination, CSR owed a duty to the longshoremen who unloaded the ships to warn them that caution should be taken to prevent hazardous exposure to the asbestos dust. There were a variety of ways that CSR could have fulfilled its legal obligation to the longshoremen. . . .

Subsection (b)(4) is satisfied under the evidence. The evidence clearly shows that in addition to the regular deliveries of asbestos fiber into the Port of Baltimore which directly caused the Plaintiffs' injuries, CSR solicited business in the [S]tate of Maryland by advertising in an asbestos trade magazine for decades. . . . Also, the shipping activity at the Port of Baltimore involving CSR's delivery of Australian sugar and CSR's asbestos fiber evidence persistent and regular utilization of the Port of Baltimore facilities for which CSR derived substantial revenue.

Respondents further contend that in taking part in the activities that support jurisdiction under the long-arm statute, CSR also maintained sufficient contacts with Maryland so as to justify the exercise of jurisdiction under the Due Process Clause. Lastly, Respondents contend that the imposition of jurisdiction in this case would in fact be constitutionally fair, as Maryland has an interest in the safety of its citizens and the safe transport of hazardous materials within the State's borders.

In analyzing the parties' contentions, we recognize that the statutory and constitutional components of our jurisdictional inquiry are not mutually exclusive. Rather, the components become merged, as this Court has held that "the long arm statute represents an effort by the Legislature to expand the boundaries of permissible *in personam* jurisdiction to the limits permitted by the Federal Constitution." *Geelhoed v. Jensen*, 277 Md. 220, 224, 352 A.2d 818, 821 (1976); *see Beyond*, 388 Md. at 22, 878 A.2d at 580 ("[O]ur statutory inquiry merges with our constitutional examination."). To illustrate, we have noted that the words "transacts any business" in subsection (b)(1) of the long-arm statute must be read with a constitutional gloss, requiring some "purposeful activity" by the defendant as a prerequisite to the exercise of jurisdiction. *Mohamed v. Michael*, 279 Md. 653, 658, 370 A.2d 551, 554 (1977). In other words, "if to exercise . . . jurisdiction in a given case would violate Due Process, we construe our long-arm statute as not authorizing the exercise of person-

al jurisdiction over the defendant." *Bond,* 391 Md. at 721, 895 A.2d at 999.

Here, Respondents contend that CSR satisfies subsections (b)(1), (b)(2), (b)(3), and (b)(4) of Maryland's long-arm statute. We need not extensively consider whether the actions of CSR at issue in this case meet the requirements for jurisdiction set forth in those provisions because we conclude, *infra,* that the Circuit Court's exercise of jurisdiction would have offended the Due Process Clause.[10]

■ "To comply with the Due Process Clause of the Fourteenth Amendment, the exercise of personal jurisdiction over an out-of-state defendant requires that the defendant have established minimum contacts with the forum state and that to hale him or her into court in the forum state would comport with traditional notions of fair play and substantial justice." *Bond,* 391 Md. at 722, 895 A.2d at 1000 (citing *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490, 501 (1980); *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 1239–40, 2 L.Ed.2d 1283, 1297–98 (1958); *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95, 102 (1945); *Mackey,* 391 Md. at 129–30, 892 A.2d at 486).

■ The "minimum contacts" standard "is not susceptible of mechanical application, and the facts of each case must be weighed. . . ." *Camelback Ski Corp. v. Behning (Camelback I),* 307 Md. 270, 274, 513 A.2d 874, 876 (1986), *vacated,* 480 U.S. 901, 107 S.Ct. 1341, 94 L.Ed.2d 512 (1987), *aff'd, Camelback Ski Corp. v. Behning (Camelback II),* 312 Md. 330, 539 A.2d 1107 (1988). As the United States Supreme Court observed in *Kulko,* the determination as to whether a defendant has maintained sufficient minimum contacts with the forum state "is one in which few answers will be written in

---

10. In this regard, our analysis is consistent with this Court's prior cases holding that a violation of due process obviates the need to engage in an extensive statutory inquiry. *See, e.g., Bond v. Messerman,* 391 Md. 706, 895 A.2d 990 (2006); *Beyond,* 388 Md. 1, 878 A.2d 567; *Camelback II,* 312 Md. 330, 539 A.2d 1107.

'black and white. The greys are dominant and even among them the shades are innumerable.'" 436 U.S. at 92, 98 S.Ct. at 1697, 56 L.Ed.2d at 141 (quoting *Estin v. Estin,* 334 U.S. 541, 545, 68 S.Ct. 1213, 1216, 92 L.Ed. 1561, 1566 (1948)); *see also Camelback II,* 312 Md. at 338, 539 A.2d at 1111 (noting that "the quality and quantity of contacts required to support the exercise of personal jurisdiction will depend upon the nature of the action brought and the nexus of the contacts to the subject matter of the action"). As such, cases may be divided into the categories of specific or general jurisdiction, with each category requiring a different quantum of contacts to confer jurisdiction. *Presbyterian Univ. Hosp. v. Wilson,* 337 Md. 541, 551 n. 2, 654 A.2d 1324, 1329–30 n. 2 (1995); *Camelback II,* 312 Md. at 339, 539 A.2d at 1111.

A case of specific jurisdiction arises where the cause of action arises from, or is directly related to, the defendant's contacts with the forum state. *Wilson,* 337 Md. at 550, 654 A.2d at 1329. In *Beyond,* this Court set forth the following three-pronged inquiry for determining whether the exercise of specific personal jurisdiction would comport with due process:

[W]e consider (1) the extent to which the defendant has purposefully availed itself of the privilege of conducting activities in the State; (2) whether the plaintiffs' claims arise out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable.

388 Md. at 26, 878 A.2d at 582.

"[U]nder general jurisdiction, the basis for the plaintiff's cause of action need not arise out of the defendant's contacts in the forum." *Wilson,* 337 Md. at 550, 654 A.2d at 1329. To justify the exercise of general jurisdiction, the defendant's contacts with the forum state must be continuous and systematic. *See Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 416, 104 S.Ct. 1868, 1873, 80 L.Ed.2d 404, 412 (1984); *Wilson,* 337 Md. at 552, 654 A.2d at 1330 ("[A] holding that a forum may exert general jurisdiction over a party involves a legal finding that the defendant

maintains continuous and systematic contacts with the forum which constitute doing business in the forum."). Nevertheless, even in the context of general jurisdiction, we must consider whether the defendant "purposefully availed itself of the privilege of conducting activities in the State," and "whether the exercise of personal jurisdiction would be constitutionally reasonable." *Beyond,* 388 Md. at 26, 878 A.2d at 582; *Camelback I,* 307 Md. at 277, 513 A.2d at 877; *see also Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 476, 105 S.Ct. 2174, 2184, 85 L.Ed.2d 528, 543 (1985) ("Once it has been decided that a defendant purposefully established minimum contacts within the forum State, these contacts may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with 'fair play and substantial justice.' ").

In *Camelback II,* this Court rejected a strict dichotomy of the concepts of specific and general jurisdiction:

The concept of specific and general jurisdiction is a useful tool in the sometimes difficult task of detecting how much contact is enough, and most cases will fit nicely into one category or the other. If, however, the facts of a given case do not naturally place it at either end of the spectrum, there is no need to jettison the concept, or to force-fit the case. In that instance, the proper approach is to identify the approximate position of the case on the continuum that exists between the two extremes, and apply the corresponding standard, recognizing that the quantum of required contacts increases as the nexus between the contacts and the cause of action decreases.

312 Md. at 339, 539 A.2d at 1111; *see also Wilson,* 337 Md. at 551 n. 2, 654 A.2d at 1329 n. 2 (noting that under the reasoning of *Camelback II* "a trial judge need not segregate factors tending to support general jurisdiction from those supporting specific jurisdiction").

The instant case involves, primarily, an issue of specific jurisdiction because Respondents' cause of action resulted allegedly from CSR's use of the Maryland Port as a conduit in

shipping raw asbestos to United States customers. The contacts supporting a specific jurisdiction analysis are CSR's acts of shipping asbestos into the Port, as evidenced by the affidavits of Lloyd and William Gardner, and the four invoices submitted to the Circuit Court by Respondents. There are also contacts in this case that, because Respondents' cause of action does not arise therefrom, trigger a general jurisdiction analysis. The "general" jurisdictional contacts are CSR's various acts of shipping sugar into the Maryland Port. Finally, CSR maintained additional contacts with Maryland that do not fit neatly into the categories of either specific or general jurisdiction, instead falling somewhere in the middle of the spectrum. Those contacts are CSR's acts of advertising asbestos products in the Asbestos trade publication. In accordance with *Camelback II, supra,* we shall consider the totality of CSR's contacts with the forum state to determine whether the exercise of personal jurisdiction would comport with due process.

### Purposeful Availment Analysis

[16, 17] Notwithstanding the distinctions between general and specific personal jurisdiction, " '[i]t is essential in each case that there be some act by which the defendant *purposefully avails* itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.' " *Camelback I,* 307 Md. at 277, 513 A.2d at 877 (quoting *Hanson,* 357 U.S. at 253, 78 S.Ct. at 1240, 2 L.Ed.2d at 1298). Thus, the absence of any purposeful availment by the defendant stands as an obstacle to whether the defendant's contacts with the forum state amount to the sufficient minimum contacts necessary to confer jurisdiction in either a specific or general jurisdiction context.

The United States Supreme Court explained the rationale behind the "purposeful availment" requirement in *Burger King Corp.,* 471 U.S. at 475–76, 105 S.Ct. at 2183–84, 85 L.Ed.2d at 542–43:

T[he] "purposeful availment" requirement ensures that a defendant will not be haled into a jurisdiction solely as a

result of "random," "fortuitous," or "attenuated" contacts, or of the "unilateral activity of another party or a third person." Jurisdiction is proper, however, where the contacts proximately result from actions by the defendant *himself* that create a "substantial connection" with the forum State. Thus where the defendant "deliberately" has engaged in significant activities within a State, or has created "continuing obligations" between himself and residents of the forum, he manifestly has availed himself of the privilege of conducting business there, and because his activities are shielded by "the benefits and protections" of the forum's laws it is presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well.

(Citations and footnotes omitted).

In *World–Wide Volkswagen Corp.,* the Supreme Court also held that Oklahoma did not have personal jurisdiction over a New York auto dealer after the plaintiffs, Oklahoma residents, purchased a vehicle in New York and were injured in an auto accident in their home state. 444 U.S. at 298–99, 100 S.Ct. at 567–68, 62 L.Ed.2d at 502. The plaintiffs argued that, based on the "mobility" of cars, and because the defendant auto dealer could have clearly foreseen that a car sold in New York could be driven in Oklahoma, there was purposeful availment. *World–Wide Volkswagen Corp.,* 444 U.S. at 295, 100 S.Ct. at 566, 62 L.Ed.2d at 500. The Supreme Court disagreed, however, noting that:

"foreseeability" alone has never been a sufficient benchmark for personal jurisdiction under the Due Process Clause. . . .

This is not to say, of course, that foreseeability is wholly irrelevant. But the foreseeability that is critical to due process analysis is not the mere likelihood that a product will find its way into the forum State. Rather, it is that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there. . . .

When a corporation "purposefully avails itself of the privilege of conducting activities within the forum State," it

has clear notice that it is subject to suit there.... The forum State does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its goods into the stream of commerce with the expectation that they will be purchased by consumers in the forum State.

*World–Wide Volkswagen Corp.*, 444 U.S. at 295, 297–98, 100 S.Ct. at 566, 567, 62 L.Ed.2d at 500, 501–02 (citations omitted).

In *Asahi Metal Industry Co. v. Superior Court of California*, 480 U.S. 102, 105, 107 S.Ct. 1026, 1029, 94 L.Ed.2d 92, 100–01 (1987), the United States Supreme Court considered whether a California court could exert jurisdiction over Asahi Metal Industry Co., Ltd. ("Asahi"), a Japanese producer of tire valve assemblies that sold its products to a Taiwanese tire manufacturer. An individual injured when he lost control of his motorcycle in California sued the Taiwanese manufacturer in the State, alleging that the cycle's tire, tube, and sealant were defective. *Asahi*, 480 U.S. at 105–06, 107 S.Ct. at 1029, 94 L.Ed.2d at 100. The Taiwanese tire manufacturer then cross-claimed against Asahi. *Asahi*, 480 U.S. at 106, 107 S.Ct. at 1029, 94 L.Ed.2d at 100.

The *Asahi* Court split over whether Asahi satisfied the "purposeful availment" requirement, thereby attaining sufficient minimum contacts with California. In one plurality opinion, Justice Sandra Day O'Connor, joined by three of the other Justices, adopted the view that mere awareness that the stream of commerce might sweep Asahi's products into the forum state did not constitute purposeful availment. Justice O'Connor explained:

The placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State. Additional conduct of the defendant may indicate an intent or purpose to serve the market in the forum State, for example, designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the

product through a distributor who has agreed to serve as the sales agent in the forum State. But a defendant's awareness that the stream of commerce may or will sweep the product into the forum State does not convert the mere act of placing the product into the stream into an act purposefully directed toward the forum State.

*Asahi,* 480 U.S. at 112, 107 S.Ct. at 1032, 94 L.Ed.2d at 104 (plurality opinion). In a second plurality opinion, Justice William Brennan, joined by three Justices, disagreed with Justice O'Connor's position, concluding that Asahi's mere placement of a product into the stream of commerce was purposeful availment and therefore sufficient to satisfy the minimum contacts standard. According to Justice Brennan,

[t]he stream of commerce refers to not unpredictable currents or eddies, but to the regular and anticipated flow of products from manufacture to distribution to retail sale. As long as a participant in this process is aware that the final product is being marketed in the forum State, the possibility of a lawsuit there cannot come as a surprise.

*Asahi,* 480 U.S. at 117, 107 S.Ct. at 1034, 94 L.Ed.2d at 107 (plurality opinion).

Notwithstanding the Justices' disagreement over whether the Asahi company satisfied the "purposeful availment" requirement, the *Asahi* Court held ultimately that the exercise of jurisdiction by a California court would offend traditional notions of "fair play and substantial justice," thus making the exercise of jurisdiction constitutionally unreasonable. 480 U.S. at 116, 107 S.Ct. at 1034, 94 L.Ed.2d at 107. Among the factors considered by the United States Supreme Court to determine whether the exercise of jurisdiction would be constitutionally reasonable were "the burden on the defendant, the interests of the forum State, and the plaintiff's interest in obtaining relief." *Asahi,* 480 U.S. at 113, 107 S.Ct. at 1033, 94 L.Ed.2d at 105. It also considered "the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and the shared interest of the several States in furthering fundamental substantive social policies." *Id.*

We consider Justice O'Connor's opinion in *Asahi*, advocating what we shall term the "stream-of-commerce-plus" theory, to be more persuasive than Justice Brennan's opinion in that case with regard to what constitutes purposeful availment. Indeed, Justice O'Connor's opinion is most consistent with the Court's earlier pronouncements in such cases as *Burger King Corp.* and *World–Wide Volkswagen Corp., supra.* Moreover, the majority of federal and state courts have not adopted the more lenient theory of personal jurisdiction advanced by Justice Brennan. *See, e.g., Boit v. Gar–Tec Prods., Inc.,* 967 F.2d 671, 683 (1st Cir.1992) ("[T]hose circuits that have squarely addressed the stream-of-commerce issue since *Asahi* have adopted Justice O'Connor's plurality view."); Alison G. Myhra, *Civil Procedure,* 39 TEX. TECH. L.REV. 689, 706 n. 120 (2007) (surveying cases); *see also Luv N' Care, Ltd. v. Insta–Mix, Inc.,* 438 F.3d 465, 474 (5th Cir.2006) (DeMoss, J., specially concurring) ("Justice O'Connor's stream-of-commerce-plus theory is the more constitutionally defensible of the two theories of minimum contacts to emerge from *Asahi.*"). For example, in *Boit* the United States Court of Appeals for the First Circuit held that a foreign manufacturer's sale of its products to a mail-order company, which later sold those products in the forum state, did not support the exercise of personal jurisdiction over the foreign manufacturer. 967 F.2d at 683. "Mere awareness" that the foreign manufacturer's products might end up in the forum state through the mail, the court held, did not constitute purposeful availment. *Id.*

Similar to *Boit,* the Fourth Circuit held in *Lesnick v. Hollingsworth & Vose Co.,* 35 F.3d 939 (4th Cir.1994), that a Massachusetts manufacturer's sale of cigarette filters to a cigarette company, with plants in Kentucky and New Jersey, that then distributed those filters nationally in its Kent brand of cigarettes, was insufficient to support jurisdiction in Maryland. The *Lesnick* court stated:

> The touchstone of the minimum contacts analysis remains that an out-of-state person have engaged in some activity *purposefully directed toward the forum state* .... To permit a state to assert jurisdiction over any person in the

country whose product is sold in the state simply because a person must expect that to happen destroys the notion of individual sovereignties inherent in our system of federalism.

35 F.3d at 945 (emphasis added).

In recognizing the "stream-of-commerce-plus" theory, we also acknowledge that the theory is consistent with the Court of Special Appeals' analysis in *Hollingsworth v. Connor*, 136 Md.App. 91, 764 A.2d 318 (2000). *Hollingsworth* concerned the same facts as in *Lesnick, supra.* In holding that the Circuit Court for Baltimore City could not justifiably exercise jurisdiction over the defendant, H & V, located in Massachusetts, the intermediate appellate court recognized that H & V did no more than place its products into the stream of commerce. *Hollingsworth*, 136 Md.App. at 114–15, 764 A.2d at 330–31. The court stated that "[a]lthough it is reasonable to assume that H & V was aware that its filters, as components of Kent cigarettes, would be purchased and smoked within the State of Maryland, this will not suffice to establish minimum contacts." *Hollingsworth*, 136 Md.App. at 114, 764 A.2d at 331.

Turning now to the instant case, we disagree with the Court of Special Appeals' reliance, in the proceedings below, on *Kopke, supra,* a case decided by the Wisconsin Supreme Court. *See Taylor*, 181 Md.App. at 384–85, 956 A.2d at 766–67. The intermediate appellate court held "that CSR's packaging and shipping of asbestos, during which it identified the contents and port destination of Baltimore, [was] tantamount to the kind of purposeful distribution of goods that the *Kopke* court concluded supported a finding of sufficient minimum contacts." *Taylor*, 181 Md.App. at 385, 956 A.2d at 767. In *Kopke*, a Wisconsin truck driver was injured when a pallet loaded with paper fell on him while he was unloading an ocean-going container that allegedly had been negligently packed by an Italian loading company. 629 N.W.2d at 666–67. In contrast to the *Kopke* court, we do not consider cargo "introduced into the stream of commerce with the expectation

that it w[ill] arrive in th[e] forum," 629 N.W.2d at 675, sufficient to constitute purposeful availment in Maryland.[11]

▬▬▬▬ To satisfy the "purposeful availment" requirement in Maryland, mere foreseeability that a defendant's products will enter the State and cause injury here is insufficient. *Bond,* 391 Md. at 730, 895 A.2d at 1005. Rather, the defendant must "create a 'substantial connection' " with Maryland such that having to defend a lawsuit in the State would be foreseeable. *See Burger King Corp.,* 471 U.S. at 475, 105 S.Ct. at 2184, 85 L.Ed.2d at 542. A substantial connection is forged where the defendant either engages in significant activities in the State or creates continuing obligations with the State's residents, thus taking advantage of the benefits and protections of Maryland law. *Burger King Corp.,* 471 U.S. at 475–76, 105 S.Ct. at 2184, 85 L.Ed.2d at 543. "Designing [a] product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State" exemplify purposeful availment. *See Asahi,* 480 U.S. at 112, 107 S.Ct. at 1032, 94 L.Ed.2d at 104 (plurality opinion); *see also, e.g., Wilson,* 337 Md. 541, 654 A.2d 1324 (holding that a Maryland court could exercise jurisdiction over an out-of-state hospital that provided

---

11. Even if we concluded that the mere entry of a product into the stream-of-commerce satisfies the "purposeful availment" requirement, we would nevertheless hesitate to apply that principle in this case, which is not a typical "stream-of-commerce" case. A typical stream of commerce case arises where a manufacturer sells its goods to another manufacturer and those goods cause an injury to someone further down the stream. *See, e.g., Asahi Metal Industry Co. v. Superior Court of Calif.,* 480 U.S. 102, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987); *Lesnick v. Hollingsworth & Vose Co.,* 35 F.3d 939 (4th Cir.1994); *Boit v. Gar–Tec Prods., Inc.,* 967 F.2d 671 (1st Cir.1992); *Hollingsworth v. Connor,* 136 Md.App. 91, 764 A.2d 318 (2000). Under such circumstances, the original manufacturer of the defective product may be subject to personal jurisdiction in the forum where the injury occurred. In the case *sub judice,* however, Respondents' injuries allegedly resulted from circumstances preceding the entry of CSR's goods into the "stream-of-commerce," as such goods were still raw materials, in transit as between CSR and other manufacturers.

services to Maryland residents and registered as a Maryland provider, designating itself as a liver transplant referral center); *Mohamed,* 279 Md. at 659, 370 A.2d at 554 (holding that a Maryland court could exert jurisdiction over a Kentucky resident whose agent engaged in "intensive" negotiations with a temporary resident of Maryland to resolve a contract dispute); *Harris v. Arlen Properties,* 256 Md. 185, 260 A.2d 22 (1969) (holding that a Maryland court could exercise jurisdiction over an out-of-state real estate development company that scouted potential development sites in Maryland and, through its agents, filed a building permit in the State and arranged for the Washington Suburban Sanitation Commission to install a storm drain). Purposeful availment, however, will not arise from " 'random,' 'fortuitous,' or 'attenuated' contacts, or [from] the 'unilateral activity of another party or a third person.' " *Burger King Corp.,* 471 U.S. at 475, 105 S.Ct. at 2183, 85 L.Ed.2d at 542 (citations omitted); *see also Bond,* 391 Md. at 731, 895 A.2d at 1005 (holding that a Maryland court could not exercise jurisdiction over an Ohio lawyer when a Maryland client initiated five of seven contacts with the lawyer, the parties created the attorney-client relationship in Ohio, and the attorney-client relationship involved only events in, and the law of, Ohio). We shall analyze all of CSR's contacts with Maryland in light of our standard for purposeful availment.

## A. Shipments of Asbestos

The first contact that we shall analyze is CSR's use of the Port as a conduit in shipping raw asbestos to United States consumers located outside of Maryland. Again, in determining whether such activity constitutes purposeful availment, we look for the presence of a substantial connection between the defendant and the forum state, manifested either by engaging in significant activities in the state or creating continuing obligations with the state's residents.

CSR's shipments of raw asbestos do not satisfy the "purposeful availment" requirement because CSR neither engaged in significant activities in Maryland nor created continuing obligations with residents of the State. With respect to

our conclusion that CSR did not engage in significant activities in Maryland, we observe that CSR did not maintain a place of business in Maryland, nor was the company licensed to do business in the State. In addition, Respondents have not demonstrated that any agents of CSR conducted activities in Maryland. Although CSR's asbestos products allegedly caused injury here, the site of the "effect of the injury" is not relevant to our analysis. Indeed, as this Court acknowledged in *Bond,*

> the "effect of the injury" analysis "is not a sufficient benchmark for exercising personal jurisdiction." *Burger King Corp.,* 471 U.S. at 471–76, 105 S.Ct. at 2174, 85 L.Ed.2d 528.

> [T]he constitutional touchstone remains whether the defendant purposefully established "minimum contacts" in the forum State. Although it has been argued that foreseeability of causing *injury* in another State should be sufficient to establish such contacts there when policy considerations so require,[ ] the [United States Supreme] Court has consistently held that this kind of foreseeability is not a "sufficient benchmark" for exercising personal jurisdiction. Instead, the foreseeability that is critical to due process analysis [ ] is that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there. . . .

> *Burger King Corp.,* 471 U.S. at 474–76, 105 S.Ct. at 2183, 85 L.Ed.2d at 542.

391 Md. at 730, 895 A.2d at 1005.

As to our conclusion that CSR did not create continuing obligations with any Maryland residents, we note that Respondents have not demonstrated the existence of a relationship between either CSR and any consumers of asbestos in Maryland or CSR and the Maryland stevedores. In *Camelback II* we stated that "[o]rdinarily, one who purposefully sends a product into another jurisdiction *for purposes of sale* may reasonably expect to be haled into court in that State if the product proves to be defective and causes injury there." 312

Md. at 340, 539 A.2d at 1112 (emphasis added) (footnote omitted). Here, however, Respondents have not demonstrated that CSR shipped asbestos products to any Maryland consumers; instead, CSR used the Maryland Port as a conduit in shipping asbestos to consumers located outside of the State, in locations such as New York. Although our statement in *Camelback II* would support hailing CSR into a New York court, that statement is irrelevant to whether the Circuit Court for Baltimore City may justifiably exercise jurisdiction over CSR in the case *sub judice.*

 In addition, although Respondents' maritime expert, Captain Robert Stewart, stated that CSR was responsible for paying freight charges, including the costs of hiring a stevedore company, it is not apparent that CSR actually hired the stevedore company. Rather, it is more likely that CSR paid freight charges to a carrier that then contracted with the stevedores who worked at the Maryland Port. " 'The unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State.' " *Bond,* 391 Md. at 731, 895 A.2d at 1005 (quoting *Hanson,* 357 U.S. at 253, 78 S.Ct. at 1239–40, 2 L.Ed.2d at 1298).

 Furthermore, it is relevant to our analysis that CSR's act of shipping asbestos into the Port was not done at the company's behest. Rather, the company's customers, all of which were located outside of Maryland, directed CSR where to make the asbestos shipments.[12] In *Bond, supra,* this Court

---

12. It appears to be undisputed that CSR did not select Baltimore as the port of delivery for its shipments of asbestos. The buyers, and more particularly one of the buyers, Johns-Manville Corporation, a non-Maryland company, made that selection. Thus, any contact with Maryland came from the buyers' or one of the buyers' decision to direct the shipment of asbestos through the State. *See World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490, 501 (1980) (holding that the exercise of personal jurisdiction over a nonresident auto distributor whose only connection to the forum resulted from a customer's decision to drive there failed to provide the defendant with "clear notice that it [would be] subject to suit" in the forum state and thus an opportunity to "alleviate the risk of burden-

considered whether the communications of an Ohio attorney with a Maryland resident sufficed to establish sufficient minimum contacts with the State of Maryland. "The relevant contacts by Messerman [the Ohio lawyer] with Bond [the Maryland resident] consisted of the alleged provision of legal advice by telephone and letters concerning the effect of and/or need for expungement of Ohio juvenile proceedings." *Id.* In holding that Messerman, the Ohio lawyer, was not subject to the jurisdiction of the Maryland courts, we emphasized that:

> [t]he number of contacts over nine years were few and the number of those initiated by Messerman were fewer still. . . . *[O]nly two of the seven relevant contacts were initiated by Messerman:* Messerman sent two letters to Bond in Maryland—one in January of 1986 and one in May of 1994. The other five contacts were commenced by Bond.

*Id.* (citations omitted). Similar to the attorney in Bond, CSR's asbestos-related contacts with Maryland were initiated by other parties—here, non-Maryland consumers—and the unilateral activity of a third party is not a grounds for conferring personal jurisdiction. Thus, we hold that CSR's use of the Port as a conduit in shipping raw asbestos to a non-Maryland ultimate destination and user does not suffice to establish the defendant's purposeful availment.

---

some litigation" there). Notwithstanding these factors, the dissent maintains that CSR purposefully directed its activities toward Maryland because CSR sent asbestos into Maryland knowing that stevedores would have to unload the asbestos, thereby subjecting CSR to the reach of Maryland's long-arm jurisdiction. Such a broad application of Maryland's long-arm statute, essentially, would permit the exercise of personal jurisdiction over every nonresident seller, for any product sold in Maryland, even if the seller had no business "presence" in the State. As the United States Supreme Court pointed out in *World–Wide Volkswagen Corp.*, in analyzing the question of personal jurisdiction over a nonresident defendant, the focus is on whether the "defendant's conduct and *connection* with the forum state are such that [the defendant] should reasonably anticipate being haled into court there." *Id.* (emphasis added). The facts of this case, unfortunately, do not satisfy the minimum conduct or *connection* that would justify the exercise of personal jurisdiction over CSR by a Maryland court.

In concluding that CSR's use of the Port in supplying raw asbestos to United States customers does not amount to purposeful availment, we need not consider the specific effect of CSR's participation in three C.I.F. arrangements during the period when Smith and Anzulis worked at the Port. Captain Stewart expressed the opinion that, under a C.I.F. agreement, CSR would have access to the Maryland courts if its goods were unjustifiably rejected. Accordingly, there is potential for the assertion that such court access constitutes CSR's taking advantage of the benefits and protections of Maryland law, thus satisfying the "purposeful availment" requirement and, ultimately, due process concerns. In other words, Captain Stewart's characterization of CSR's participation in the three C.I.F. arrangements evokes the question of whether potential "offensive" use of the Maryland courts by CSR justifies the "defensive" use of those courts against the company. We conclude that it does not, as settled Maryland law contradicts Captain Stewart's observations regarding what a C.I.F. agreement entails; specifically, the presence of a C.I.F. agreement bears no relevance as to where a seller may sue a buyer that unjustifiably rejects the seller's goods. For instance, the provision of the Maryland Code governing C.I.F. agreements, Md.Code (1975, 2002 Repl.Vol.), § 2–320 of the Commercial Law Article ("C.I.F. and C. & F. terms"),[13] is silent as to what

---

13. Md.Code (1975, 2002 Repl.Vol.), § 2–320 of the Commercial Law Article provides:

§ 2–320. C.I.F. and C. & F. terms.

(1) The term C.I.F. means that the price includes in a lump sum the cost of the goods and the insurance and freight to the named destination. The term C. & F. or C.F. means that the price so includes cost and freight to the named destination.

(2) Unless otherwise agreed and even though used only in connection with the stated price and destination, the term C.I.F. destination or its equivalent requires the seller at his own expense and risk to

(a) Put the goods into the possession of a carrier at the port for shipment and obtain a negotiable bill or bills of lading covering the entire transportation to the named destination; and

(b) Load the goods and obtain a receipt from the carrier (which may be contained in the bill of lading) showing that the freight has been paid or provided for; and

a seller's remedies are if its goods are rejected. Moreover, under a C.I.F. contract, the buyer pays the price of the goods prior to their arrival at the port of destination, thus obviating the need for the seller to sue the buyer in the jurisdiction where the goods are rejected. *See* Official Comment 1 to Md.Code (1974, 2002 Repl.Vol.), § 2–320 of the Commercial Law Article. The Official Comment to § 2–320 thus provides:

> Under a C.I.F. contract the buyer, as under the common law, must pay the price upon tender of the required documents without first inspecting the goods, but his payment in these circumstances does not constitute an acceptance of the goods nor does it impair his right of subsequent inspection or his options and remedies in the case of improper delivery. All remedies and rights for the seller's breach are reserved to him. The buyer must pay before inspection and assert his remedy against the seller afterward unless the nonconformity of the goods amounts to a real failure of consideration, *since the purpose of choosing this form of contract is to give the seller protection against the buyer's unjustifiable rejection of the goods at a distant port of destination which*

---

(c) Obtain a policy or certificate of insurance, including any war risk insurance, of a kind and on terms then current at the port of shipment in the usual amount, in the currency of the contract, shown to cover the same goods covered by the bill of lading and providing for payment of loss to the order of the buyer or for the account of whom it may concern; but the seller may add to the price the amount of the premium for any such war risk insurance; and

(d) Prepare an invoice of the goods and procure any other documents required to effect shipment or to comply with the contract; and

(e) Forward and tender with commercial promptness all the documents in due form and with any indorsement necessary to perfect the buyer's rights.

(3) Unless otherwise agreed the term C. & F. or its equivalent has the same effect and imposes upon the seller the same obligations and risks as a C.I.F. term except the obligation as to insurance.

(4) Under the term C.I.F. or C. & F. unless otherwise agreed the buyer must make payment against tender of the required documents and the seller may not tender nor the buyer demand delivery of the goods in substitution for the documents.

*would necessitate taking possession of the goods and suing the buyer there.*

*Id.* at Official Comment 12 (emphasis added).

### B. Shipments of Sugar

Next in our analysis of CSR's contacts with Maryland, we shall consider whether CSR's shipments of sugar into the Maryland Port satisfy the "purposeful availment" requirement. Like CSR's shipments of raw asbestos, Respondents have not demonstrated that CSR shipped sugar to, or engaged in business with, any consumers in Maryland.[14] Moreover, although substantial in amount and value, the record indicates that the Australian government directed the sugar shipments pursuant to the Sugar Acquisition Act of 1915, controlling all facets of production and distribution. We consider the role of the Australian government tantamount to the unilateral activity of a third party, which, again, does not suffice to demonstrate a defendant's purposeful availment.

### C. Advertising

The final contacts that we shall consider are CSR's acts of advertising asbestos products in the *Asbestos* trade publication. In the Circuit Court, Respondents produced the affidavit of Dr. Barry Castleman, who observed that CSR regularly advertised the sale of asbestos products in the *Asbestos* publication during the period when Smith and Anzulis worked at the Port. Dr. Castleman also expressed the opinion that CSR would have known that such advertisements would reach potential consumers in Maryland.

In *Camelback II,* this Court considered advertising efforts similar to those of CSR in determining whether the exercise of jurisdiction over an out-of-state defendant would comport with due process. 312 Md. 330, 539 A.2d 1107. In that case, the

---

**14.** Without any citation to the record, Respondents contend in their brief that the sugar shipments "were purposefully directed to the Port of Baltimore for the obvious reason that the Domino sugar plant is located in the Inner Harbor." Respondents, however, have not demonstrated the existence of any relationship between CSR and Domino.

defendant, a Pennsylvania ski resort, supplied brochures to ski shops in Maryland and provided a toll-free telephone number by which Maryland residents, among others, could obtain information about snow conditions. *Camelback II,* 312 Md. at 333–34, 539 A.2d at 1108–09. In addition, the defendant was aware that wire services carried information concerning snow conditions at the resort and that such information was reproduced in Maryland newspapers. *Camelback II,* 312 Md. at 341, 539 A.2d at 1112. We declined to hold that the defendant's advertising-related contacts met the standard for purposeful availment, as "[the resort] did not devote its energy or financial resources to the marketing of Maryland." *Camelback II,* 312 Md. at 341, 539 A.2d at 1112. Similarly, in the case *sub judice,* CSR did not target its advertising efforts toward potential consumers in Maryland; it advertised asbestos products in a general trade publication, and although it was foreseeable that such advertisements would be viewed in Maryland, that fact alone is not sufficient to confer jurisdiction in light of *Camelback II.*

## Conclusion

Because we conclude in the foregoing analysis that CSR has not, in the course of any of its contacts with Maryland, satisfied the "purposeful availment" requirement, thus attaining sufficient minimum contacts with the State, we need not consider whether the exercise of personal jurisdiction would be constitutionally reasonable as required by our tests for either specific or general jurisdiction. *See Camelback I,* 307 Md. at 286, 513 A.2d at 882 (noting that the fairness factors "cannot alone serve as the foundation for assumption of jurisdiction" (citing *World–Wide Volkswagen Corp.,* 444 U.S. at 294, 100 S.Ct. at 565, 62 L.Ed.2d at 499; *Hanson,* 357 U.S. at 251, 78 S.Ct. at 1238, 2 L.Ed.2d at 1296)). We also note that any apparent unfairness to Respondents in this case must be considered in light of the fact that

> [t]he law of personal jurisdiction ... is asymmetrical. The primary concern is for the burden on a defendant. If the burdens of trial are too great for a plaintiff, the plaintiff can

decide not to sue or, perhaps, to sue elsewhere. A defendant has no such luxury. The burdens on a defendant are of particular significance if . . . the defendant has done little to reach out to the forum state.

*Ins. Co. of N. America v. Cruz,* 649 F.2d 1266, 1272 (9th Cir.1981) (citing *World–Wide Volkswagen Corp.,* 444 U.S. at 292, 100 S.Ct. at 564, 62 L.Ed.2d at 498). The Court of Special Appeals erred in concluding that CSR had sufficient minimum contacts with the State of Maryland to support the Circuit Court's exercise of personal jurisdiction.

***JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THE COURT OF SPECIAL APPEALS WITH DIRECTIONS TO AFFIRM THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY THE RESPONDENTS.***

BELL, C.J., MURPHY and RAKER, JJ., Dissent.

Dissenting Opinion by MURPHY, J., which BELL, C.J., and RAKER, J., join.

I do not agree with the majority's holding "that the Court of Special Appeals erred in concluding that [Petitioner] had sufficient minimum contacts with the State of Maryland to support the Circuit Court's exercise of personal jurisdiction." In *Taylor v. CSR,* 181 Md.App. 363, 956 A.2d 754 (2008), the Court of Special Appeals stated:

Taylor presented evidence that the cause of action arose from CSR's direct shipment of asbestos to the Port of Baltimore, where Smith and Anzulis were stevedores, and expert testimony that CSR would reasonably expect that its cargo of asbestos would be unloaded by stevedores at the port, who could be exposed to the asbestos if the burlap bags were ripped. Taylor also presented evidence that CSR had other contacts with Maryland unrelated to Smith's or Anzulis' injuries, when they advertised regularly in a United States asbestos industry magazine. CSR also mar-

keted and arranged all Australian exports of sugar and, from 1964 to 1966, $ 66.5 million dollars worth of sugar (in 2005 dollars) arrived at the Port of Baltimore from Australia.

*Id.* at 383–84, 956 A.2d at 766.

Unlike Camelback ski resort, CSR's asbestos shipments are examples of purposeful directing of product to Maryland. In shipping the asbestos to the Port of Baltimore, to be first unloaded before being sent on for sale elsewhere, CSR did not just knowingly accept the benefit that would be brought through an interstate distribution of goods. **CSR, instead, purposefully sent asbestos into Maryland with an expectation that it would be handled by Maryland stevedores. By doing so, CSR might reasonably have expected to be haled into court in Maryland if its asbestos shipments proved to be dangerously packaged, causing injury to the stevedores in Maryland.** This does not mean, necessarily, that Maryland would have jurisdiction over a suit brought by a person who happened to be near the place where the stevedores were unloading the asbestos. Nor does it mean that Maryland would have jurisdiction in suits brought by other Maryland residents claiming injury from asbestos. **The case for jurisdiction when the stevedores or their representatives are plaintiffs has the additional and significant factor that CSR knew when it shipped the asbestos that stevedores would unload the bags.**

*Id.* at 387–88, 956 A.2d at 768. (Emphasis supplied). I agree with those statements.

In my opinion, it is of no consequence that—because of the "payment in advance" requirement in the "C. & F./C.I.F." shipping contracts—Petitioner did not need access to Maryland courts to sue a buyer who rejected the cargo. What is of consequence, however, is that Petitioner would certainly have expected to be haled into a Maryland court by a dissatisfied buyer who rejected the goods delivered to the Port of Baltimore and sued Petitioner for breach of contract.

The holding of the Court of Special Appeals is actually more limited than the holdings in *State ex rel. CSR Ltd. v. Mac-Queen, et al.*, 190 W.Va. 695, 441 S.E.2d 658 (1994) and *W.R. Grace & Co. v. Ensey*, 279 Ill.App.3d 1043, 216 Ill.Dec. 840, 666 N.E.2d 8 (1996), in which the Supreme Court of Appeals of West Virginia and the Appellate Court of Illinois, Third District, affirmed trial court rulings requiring CSR to defend lawsuits filed against it in those states. In each of those cases, (1) the lawsuits at issue sought to hold CSR liable for injuries resulting from "job site" exposure to building materials manufactured by Johns-Manville that contained asbestos purchased by Johns-Manville from CSR, (2) CSR moved to dismiss the lawsuits on the ground that it had no control over the distribution of products that Johns-Manville manufactured and thereafter shipped into the forum state, and (3) the trial court denied CSR's motion.

In *MacQueen, supra,* while affirming the decision of the Circuit Court of Kanawha County (by denying CSR's petition for writ of prohibition in which it challenged Judge Mac-Queen's ruling on jurisdiction), the Supreme Court of Appeals of West Virginia stated:

> Specifically, the plaintiffs-respondents contend that CSR sought to exploit the American market for raw asbestos by systematically and continuously selling substantial quantities (37,000 tons) of crocidolite asbestos to Johns Manville between 1948 and 1966. CSR's own sales records, plaintiffs-respondents argue, show that CSR shipped fiber to ports in various states. Notably, CSR does not contest jurisdiction in the states to which the fiber then was routed—specifically, Johns Manville plants located in Louisiana, New Jersey, Illinois, Texas and California.[1]

> 1 We note that CSR made these representations at oral argument.

> \* \* \*

At oral argument, it became apparent that CSR has confused jurisdictional issues with questions of CSR's innocence of wrongdoing. In a nutshell, CSR argues that as simply a manufacturer of raw materials, it is not liable to

the plaintiffs in this mass tort case. Unlike a manufacturer of a defective component part that caused some end product to fail, CSR contends its role was more comparable to a manufacturer of raw steel, with no control over the end product into which its raw material was incorporated.

This Court, however, is satisfied that CSR introduced a product into the stream of American commerce that it knew would be used in West Virginia.

\* \* \*

Obviously, as the Supreme Court of the United States held in *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 294, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980), jurisdiction cannot be asserted over a defendant with which a state has no contacts, no ties and no relations. However, in the case before us, the evidence is virtually incontrovertible that CSR introduced its asbestos fibers into the stream of American commerce; CSR knew the products containing their fibers would be distributed throughout the United States; CSR had an ongoing commercial relationship with Johns Manville, the largest American manufacturer of asbestos products; and, CSR was actively engaged in the development and introduction of products that contained their raw materials. These circumstances are sufficient at this time to give our courts jurisdiction.

*Id.* at 660–61.

In *W.R. Grace & Co., supra,* while affirming the Circuit Court of Rock Island County (after the Supreme Court of Illinois entered a supervisory order that CSR be granted the right to file an interlocutory appeal), the Appellate Court of Illinois stated:

Between 1948 and 1966, CSR acted as the sales agent for its partially-owned subsidiary which mined raw asbestos fibers. CSR sold the asbestos to Manville, F.O.B. various ports in Australia. Manville then used the asbestos, along with asbestos from various other suppliers from around the world, to manufacture asbestos-containing products at its plants throughout the United States. Manville was one of

the world's largest manufacturers of asbestos products. The record before us establishes that CSR sold Manville 37,000 tons of crocidolite asbestos (blue fiber) from 1948 until 1966.

CSR maintains there is no evidence to support Ensey's claim that CSR was aware that its blue fiber was coming to Illinois. In oral argument before this court, CSR claimed that if its asbestos made its way to Illinois, Manville is to blame, not CSR.... We note initially that CSR has confused jurisdictional issues with causation and proof issues. The jurisdictional issue before us is preliminary to, and independent of, any determination of the merits of Ensey's claims.

\* \* \*

The record before us supports a finding of minimum contacts. This result is obtained under any of the three Supreme Court views [in *Asahi Metal Industry Co. v. Superior Court,* 480 U.S. 102, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987),] discussed above. Under Justice Brennan's analysis, it is clear that CSR introduced tons of asbestos into the stream of commerce with knowledge that it was being incorporated into products manufactured by Manville for use in Illinois and every other state. Moreover, under Brennan's analysis, because CSR was aware that its asbestos was being sold in Illinois, it cannot claim it is an unfair surprise that it is required to defend a lawsuit in this state. *Asahi,* 480 U.S. at 117, 107 S.Ct. at 1034–35, 94 L.Ed.2d at 107.

Jurisdiction is also proper under Justice O'Connor's analysis. The record before us supports the assertion that CSR did more than just place its asbestos into the stream of commerce. CSR had an on-going commercial relationship with Manville. CSR officials visited the United States to promote the use of their blue fiber, suggest new uses, and assure competitive pricing and quality. In October 1956, a CSR official attended a Manville sales conference in the United States and met with senior officers from all Manville plants. At the time, Manville had a factory in Waukegan,

Illinois. A CSR official interviewed a number of Manville officials and received no complaints regarding the quality of CSR's blue fiber. CSR advertised in a national trade magazine. As a result, we find ample evidence of "additional conduct" by CSR in reaching out to Illinois and promoting the sale and use of its product here.

We further conclude that the contacts mentioned above also satisfy the requirements of *World–Wide*. Through its ongoing and continuous relationship with Manville, nationwide advertising, and the promotion of expanded use of its asbestos, CSR sought to serve the market for its product in Illinois. As a consequence, CSR could certainly anticipate being haled into court in this forum.

* * *

After establishing that CSR has the required minimum contacts with Illinois, we must examine other relevant factors to determine whether it is reasonable and fair for our courts to exercise personal jurisdiction over CSR. Such factors may include (1) the burden on the defendant; (2) the interest of the forum state; (3) the interest of the plaintiff in obtaining relief; (4) the interest of the interstate judicial system in obtaining the most efficient relief; and (5) the interests of our sister states in furthering their own policies. *Asahi*, 480 U.S. at 113, 107 S.Ct. at 1032–33, 94 L.Ed.2d at 105. An analysis of the relevant factors clearly reveals that the exercise of personal jurisdiction in Illinois is reasonable and fair.

While we are mindful that CSR is a foreign corporation, the record indicates only a slight burden for CSR to defend this action in Illinois. CSR has been a party to litigation in several states and has retained local counsel. As a result, CSR is no stranger to the United States legal system. In addition, some discovery has already occurred, and documentation is available in Illinois. In contrast, Ensey's interest in obtaining relief in Illinois is great. As CSR's counsel conceded in oral argument before this court, Ensey would be forced to seek relief in Australia if she is not afforded the opportunity to maintain her lawsuit in Illinois.

Clearly, such a burden on Ensey would be prohibitive. Similarly, Illinois has a great interest in providing a forum by which its citizens may seek relief from wrongs they have suffered.

*Id.* at 9–12.

The holding of the Court of Special Appeals is not inconsistent with the case of *CSR Ltd. v. Link,* 925 S.W.2d 591 (Tex.1996), in which the Supreme Court of Texas (by "conditionally" granting CSR's petition for writ of mandamus) held that the District Court of Harris County erroneously asserted personal jurisdiction over CSR on the basis of the following facts:

On August 23, 1957, CSR sold 363 tons of raw Australian blue asbestos to Johns–Manville. CSR sold the asbestos to Johns–Manville F.O.B. Fremantle, Australia, so that title to the fiber passed to Johns–Manville when Johns–Manville loaded the fiber onto the ship in Australia. Johns–Mansville shipped the asbestos to Houston; the fiber was eventually used for the manufacture of transite pipe. The plaintiffs in the underlying suit allege that they were injured by exposure to CSR asbestos used to manufacture pipe.

*Id.* at 594. While I agree with the Supreme Court of Texas that those facts did not permit the Harris County District Court to assert either "general" or "specific" jurisdiction over CSR, the case at bar does not involve either (1) a single shipment of asbestos to the Port of Baltimore, or (2) plaintiffs who allege that they were injured by exposure to a manufactured product that contained asbestos sold by CSR. I am persuaded that the Supreme Court of Texas would not have issued a writ of mandamus if the record showed that (1) CSR had shipped to Houston the amount of asbestos and sugar that it had shipped to the Port of Baltimore, and (2) the plaintiffs were stevedores who alleged that they had been injured when unloading "CSR-labeled burlap bags containing asbestos, [under circumstances when] dust would be 'all over the place.'"

While forcing Respondents to assert their claims in Australia is (in the words of the *W.R. Grace & Co.* Court) "prohibi-

tive," CSR's litigation history includes a lawsuit that it filed in the United States District Court for the District of New Jersey against various insurance companies—including Australian companies from whom CSR purchased insurance in Australia. The second amended complaint that CSR filed in that case (Civil Action No. 95–2947(HAA)) includes the following assertions:

10. Plaintiff CSR is an Australian public company with its principal place of business at Level 24, 1 O'Connell Street, Sydney 2000 Australia. CSR is a diversified company engaged in, among other things, the sugar and building materials businesses. From approximately 1948 through 1966, CSR acting as sale agent for one of its subsidiaries, sold raw asbestos fiber to certain companies (primarily Johns–Manville) located in the United States. The first delivery of such fiber to the United States took place in 1949.

\* \* \*

27. To date, more than 116,000 Asbestos Claims have been asserted against CSR and/or CSR America in the United States as a result of alleged exposure to the fiber CSR sold to Manville or exposure to finished products allegedly manufactured by Manville with CSR's asbestos fiber as an ingredient. CSR and/or CSR America have spent approximately $62 million to settle approximately 114,000 of those Asbestos Claims, including more than $22 million to settle more than 2,400 New Jersey Asbestos Claims principally brought against CSR by former employees at the Manville plant in Manville, Middlesex County, New Jersey. In addition, CSR and/or CSR America have spent about $22 million in attorneys' fees and other legal expenses to defend against the Asbestos Claims. CSR and CSR America expect to spent millions more in settlement and defense costs in the future.

\* \* \*

34. The Policies issued to CSR provide standard from "occurrence" based coverage for asbestos-related claims

against CSR and additional insureds (including Midalco and CSR America) "anywhere in the world," including the United States. Such coverage exists so long as one or more of the Policies was in place at any time from an underlying asbestos plaintiff's first exposure to asbestos through at least the time that plaintiff manifested an asbestos-related disease. In at least one of the Policies, to which many of the Defendant Insurers subscribed, the insurers expressly agreed to submit to the jurisdiction of any Court of competent jurisdiction in the United States, to comply with all requirements necessary to give such Court jurisdiction, and to have all matters arising under their coverage determined in accordance with the law and practice of such Court.

\* \* \*

71. One month after the original complaint was filed in the instant litigation (the "U.S. Action"), CIGNA Australia and a number of other Defendants filed a parallel suit in Australia (the "Australian Action"), seeking a declaratory judgment that Defendants here have no liability to CSR or CSR America, as well as injunctive relief preventing Plaintiffs from pursuing the U.S. Action.

72. Although the Defendants were initially successful in enjoining prosecution of the instant litigation, the High Court of Australia, on August 5, 1997, ultimately terminated the injunction. The High Court found that the Australian Action was "vexatious and oppressive," and had been instituted for the purpose of terminating the U.S. Action. Finding this U.S. Action to be a more appropriate forum for the claims, particularly given the U.S. antitrust issues which cannot be adjudicated in Australia, the High court stayed the Australian Action pending the outcome of this U.S. Action.

\* \* \*

WHEREFORE, Plaintiffs request judgment against Defendants as follows:

\* \* \*

2. On Count II, for declaratory and injunctive relief requiring that Defendants defend and indemnify CSR and CSR America with respect to the asbestos-related claims that have been and will continue to be filed against them in New Jersey and elsewhere in the United States[.]

In *CSR Ltd. v. CIGNA Corp.*, 405 F.Supp.2d 526 (D.N.J. 2005), the Honorable Harold A. Ackerman ruled on motions for summary judgment on Counts III and IV of the Second Amended Complaint, but did not address Count II.

I decline to hypothesize that the Supreme Court of Appeals of West Virginia was erroneous in stating that, at oral argument in the *MacQueen* case, CSR's counsel represented that "CSR does not contest jurisdiction in the states to which the fiber ... was routed" after CSR "shipped [that] fiber to ports in various states[.]" In light of that representation, and (in the words of the Court of Special Appeals) "the additional and significant factor that CSR knew when it shipped the asbestos that stevedores would unload the bags," the conclusion that Respondents have to assert their claims in Australia strikes me as the antithesis of "fair play and substantial justice."

Chief Judge BELL and Judge RAKER have authorized me to state that they join this dissenting opinion.